2008 WY 154

**KENNEDY OIL, a Wyoming corporation,**
Appellant (Petitioner),

v.

**DEPARTMENT OF REVENUE,**
Appellee (Respondent).

No. S–07–0287.

Supreme Court of Wyoming.

Dec. 31, 2008.

Representing Appellant: Morris R. Massey of Brown, Drew & Massey, LLP, Casper, Wyoming.

Representing Appellee: Bruce A. Salzburg, Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; Karl D. Anderson, Senior Assistant Attorney General. Argument by Mr. Hardsocg.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] After the Wyoming State Board of Equalization (Board) affirmed the Department of Revenue's (DOR) valuations of Kennedy Oil's (Kennedy) coal bed methane (CBM) production for production years 2000–2002, Kennedy sought review in district court. The DOR moved for, the district court ordered and this Court accepted certification pursuant to W.R.A.P. 12.09(b).[1] We are asked to decide whether the DOR properly valued Kennedy's 2000–2002 CBM pro-

---

1. W.R.A.P. 12.09(b) provides in pertinent part:

> (b) ... in response to a motion for certification ... by any party within 30 days of the filing of the petition for review and after allowing fifteen (15) days from service for response, the district court may, as a matter of judicial discretion, certify the case to the supreme court. In determining whether a case is appropriate for certification, the district court shall consider whether the case involves:
> (1) a novel question;
> (2) a constitutional question;
> (3) a question of state-wide impact;
> (4) an important local question which should receive consideration from the district court in the first instance.;
> (5) a question of imperative public importance; or
> (6) whether an appeal from any district court determination is highly likely such that certification in the first instance would serve the interests of judicial economy and reduce the litigation expenses to the parties.

duction at the outlet of the initial dehydrator pursuant to Wyo. Stat. Ann. § 39–14–203(b)(iv) (LexisNexis 2007).

## ISSUES

[¶ 2] The primary issue for our determination concerns the point at which CBM is valued for taxation purposes. Specifically, we must decide, when a producer such as Kennedy sells its CBM production to a third party at or near the wellhead, whether the production is valued at the point of sale or at the outlet of the initial dehydrator.

## FACTS

[¶ 3] In 2000, 2001 and 2002, Kennedy produced CBM from the North, South and Central Kitty fields located in Campbell County, Wyoming. In 1999, prior to the start of production, Kennedy entered into contracts with two affiliates of Enron—a gas purchase agreement with Enron Capital & Trade Resources Corporation and a field services agreement with Enron Midstream Services, LLC. Under the gas purchase agreement, Enron purchased and received CBM from Kennedy at or very near the wellhead and was responsible for gathering and transporting it from there to available markets at the end of the pipeline. Kennedy discounted the purchase price by the costs Enron incurred in gathering and transporting the gas from the wellhead to the outlet of the initial dehydrator. The field services agreement provided for Enron to perform the gathering and transporting services for Kennedy even if the marketing aspect of the gas purchase agreement failed. After Enron filed for bankruptcy during the term of the agreements, Kennedy sold or transferred the CBM to other purchasers or field service providers under terms substantially similar to those in its contracts with Enron.

[¶ 4] For production years 2000–2002, Kennedy reported and paid taxes on its CBM production from the Kitty fields in accordance with its view that the point of valuation was the point of sale at or near the wellheads. In 2006, the Wyoming Department of Audit (DOA) completed an audit of Kennedy's 2000–2002 CBM production. The DOA determined the point of valuation to be the outlet of the initial dehydrator downstream from the wellheads. On that basis, the DOA disallowed the gathering and transportation expenses incurred between the wellheads and the outlet of the initial dehydrator. As a consequence, the DOA placed a significantly higher value on the production than Kennedy, subjecting Kennedy to additional severance and ad valorem taxes on the difference.

[¶ 5] Kennedy appealed the DOA decision to the Board, which convened a contested case hearing in January of 2007. At the hearing, Kennedy maintained that it sold the CBM at the wellhead; therefore, § 39–14–203(b)(v) applied and the fair market value of the CBM produced should be the bona fide arms length sales price. The DOR asserted that the point of valuation was the outlet of the initial dehydrator; therefore, § 39–14–203(b)(iv) applied and Kennedy should not receive deductions for expenses incurred between the wellhead and the initial dehydrator. The Board affirmed the DOR's valuation. Kennedy filed a petition for review in the district court. The DOR filed a motion for certification to this Court, which the district court granted.

## STANDARD OF REVIEW

[¶ 6] Our review of administrative agency action is governed by Wyo. Stat. Ann. § 16–3–114 (LexisNexis 2007), which provides in pertinent part:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

 [¶ 7] When reviewing a case certified to us from district court pursuant to W.R.A.P. 12.09(b), we apply the appellate standards applicable to a reviewing court of the first instance. *Williams Prod. RMT Co. v. State Dep't of Revenue*, 2005 WY 28, ¶ 7, 107 P.3d 179, 182–183 (Wyo.2005). We review factual determinations for substantial evidence, meaning we consider whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 21, 188 P.3d 554, 561 (Wyo.2008). Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did based upon all of the evidence presented. *Id.*, ¶ 23, 188 P.3d at 561. The burden of proof with respect to tax valuation is on the party asserting an improper valuation. *Williams Prod.*, ¶ 7, 107 P.3d at 183. We review an agency's conclusions of law *de novo,* and will affirm an agency's legal conclusion only if it is in accordance with the law. *Dale*, ¶ 27, 188 P.3d at 562. Statutory interpretation is a question of law and is reviewed *de novo. Williams Prod.*, ¶ 8, 107 P.3d at 183.

## DISCUSSION

### 1. *Point of Valuation*

██ [¶ 8] Kennedy asserts that the Board incorrectly ruled that the CBM covered by the audit was to be valued at the outlet of the initial dehydrator. Kennedy contends the uncontested evidence established that it sold the CBM at or near the wellhead. Citing § 39–14–203(b)(v), Kennedy maintains that the point of sale is the point of valuation for tax purposes. The DOR responds that the Board correctly found that the point of valuation was the outlet of the initial dehydrator downstream from the wellhead, not the point of sale upstream as Kennedy claimed.

[¶ 9] The relevant statutory provisions are as follows:

§ 39–14–203. Imposition.

(a) Taxable event. The following shall apply:

(i) There is levied a severance tax on the value of the gross product extracted for the privilege of severing or extracting crude oil, lease condensate or natural gas in the state. The tax imposed by this subsection shall be in addition to all other taxes imposed by law including, but not limited to, ad valorem taxes imposed by W.S. 39–13–101 through 39–13–111.

(b) Basis of tax. The following shall apply:

(i) Crude oil, lease condensate and natural gas shall be valued for taxation as provided in this subsection;

(ii) The fair market value for crude oil, lease condensate and natural gas shall be determined after the production process is completed. Notwithstanding paragraph (x) of this subsection, expenses incurred by the producer prior to the point of valuation are not deductible in determining the fair market value of the mineral;

(iii) The production process for crude oil or lease condensate is completed after extracting from the well, gathering, heating and treating, separating, injecting for enhanced recovery, and any other activity which occurs before the outlet of the initial storage facility or lease automatic custody transfer (LACT) unit;

(iv) The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator. When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial

transportation related compressor, custody transfer meter or processing facility, whichever occurs first;

(v) If the crude oil, lease condensate or natural gas production as provided by paragraphs (iii) and (iv) of this subsection are sold to a third party, or processed or transported by a third party at or prior to the point of valuation provided in paragraphs (iii) and (iv) of this subsection, the fair market value shall be the value established by bona fide arms-length transaction.

[¶10] Our review of statutory provisions is governed by the following standards:

The paramount consideration is to determine the legislature's intent, which must be ascertained initially and primarily from the words used in the statute. We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute.

*RME Petroleum Co. v. Dep't of Revenue,* 2007 WY 16, ¶25, 150 P.3d 673, 683 (Wyo. 2007) (citation omitted). We have recognized that divergent opinions among parties as to the meaning of a statute may be evidence of ambiguity but is not conclusive. *Id.,* ¶28, 150 P.3d at 684. Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court. *Id.*

[¶11] With these principles in mind, we consider the statutory provisions. Section 39–14–203(a)(i) clearly imposed a severance tax on the value of gross product that Kennedy extracted from the Kitty fields, in addition to the ad valorem tax imposed by Wyo. Stat. Ann. §§ 39–13–101 through 39–13–111 (LexisNexis 2007). Wyo. Stat. Ann. § 39–14–201(a)(xxix) (LexisNexis 2007) defines

"value of gross product" to mean "fair market value as prescribed by W.S. 39–14–203(b), less any deductions and exemption allowed by Wyoming law or rules." Section 39–14–203(b)(i) provides that natural gas is to be valued for taxation purposes as provided in this subsection, and § 39–14–203(b)(ii) provides the fair market value for natural gas is to be determined *after the production process is completed.* Paragraph (b)(ii) also clearly provides that *expenses incurred prior to the point of valuation, i.e., prior to the completion of the production process, are not deductible in determining the fair market value.* Giving this language its plain and ordinary meaning, Kennedy's CBM production was to be valued for taxation purposes at the point when the production process was completed. Any expenses Kennedy incurred up to that point (as reflected in the reduction of its sales price by the amount of Enron's costs) were not deductible in determining fair market value.

[¶12] Section 39–14–203(b)(iv)[2] defines when the production process for natural gas is completed. Under the plain language of that subsection, *the natural gas production process is completed after* it is extracted from the well, gathered, separated, injected and *any other activity which occurs before the outlet of the initial dehydrator.* Reading together paragraphs (a)(i) (levying a severance tax on the value of the gross product), (b)(i) and (ii) (valuing natural gas for taxation purposes by determining its fair market value after the production process is completed and precluding deduction of producer expenses incurred before the production process is completed); and (b)(iv) (identifying the completion of the production process as after extraction, gathering, separation, injection and any other activity occurring before the outlet of the initial dehydrator), it is clear that Kennedy's CBM production was to be valued for tax purposes by determining its fair market value after the production process was completed at the outlet of the initial dehydrator. Any expenses incurred before that point were not deductible in determining the fair market value. Thus, the costs of

---

**2.** As reflected in our quotation of the statute, § 39–14–203(b)(iii) pertains only to crude oil and lease condensate, not to natural gas; that subsection, therefore, is not relevant to this discussion.

gathering, specifically identified as a production function, and transporting, another activity occurring before the outlet of the initial dehydrator, the CBM from the point of sale to the point of valuation were not deductible but were instead to be added back in to determine fair market value. Given that the sale or transfer to Enron and other purchasers and field service providers occurred before the production process was completed within the plain language of the statute, i.e. prior to or in the course of, rather than after, activities occurring before the outlet of the initial dehydrator, any expenses Kennedy incurred in the sale or transfer were included in the fair market value. This conclusion is supported by the language of § 39–14–201(a)(xxix) which defines "value of gross product" to mean "fair market value as prescribed by W.S. 39–14–203(b), less any deductions ... allowed by Wyoming law or rules" and § 39–14–203(b)(ii) which expressly disallows deduction of expenses the producer incurs prior to the point of valuation.

[¶ 13] Despite the clear language of the above provisions, Kennedy asserts that § 39–14–203(b)(v) changes the point of valuation for taxation purposes when natural gas is sold to or processed or transported by a third party prior to completion of the production process. Kennedy contends that under those circumstances the fair market value is the value established by the sale of the gas in a bona fide arms-length transaction. Kennedy further contends that when such a sale or transfer occurs upstream from the outlet of the initial dehydrator, the producer is entitled to deduct any processing and transportation costs incurred between the point of sale or transfer and the outlet of the initial dehydrator. We disagree because we conclude that § 39–14–203(b)(iv) establishes the point of valuation, while § 39–14–203(b)(v) establishes only the method of valuation.

[¶ 14] The omission of words from a statute is considered to be an intentional act by the legislature and this Court will not read words into a statute when the legislature has chosen not to include them. *BP America Prod. Co. v. Dep't of Revenue*, 2005 WY 60, ¶ 22, 112 P.3d 596, 607 (Wyo. 2005). " 'When the words are clear and unambiguous, a court risks an impermissible substitution of its own views, or those of others, for the intent of the legislature if any effort is made to interpret or construe statutes on any basis other than the language invoked by the legislature.' " *Pagel v. Franscell*, 2002 WY 169, ¶ 9, 57 P.3d 1226, 1230 (*quoting Wyo. Community College Comm'n v. Casper Community College Dist.*, 2001 WY 86, ¶¶ 16–18, 31 P.3d 1242, 1249 (Wyo.2001)). Section 39–14–203(b)(ii) states that the fair market value for natural gas *shall be determined after the production process is complete.* It does not state, "Except as provided in paragraph (v)," the fair market value for natural gas shall be determined after the production process is complete. Likewise, § 39–14–203(b)(v) does not state, "Notwithstanding paragraph (ii)," if the natural gas production is sold or transported by a third party, the fair market value shall not be determined after the production is complete but shall be the value established by sales price in a bona fide arms-length transaction. Paragraph (v) also does not state that the "point of valuation" changes or that the production process is complete when production is sold or transferred to a third party before the point of valuation described in paragraph (iv).

[¶ 15] Additionally, subsection (ii) states that expenses incurred by the producer prior to the point of valuation are not deductible in determining fair market value. It does not state, "Except as provided in paragraph (v)," such expenses are not deductible. Nor does subsection (v) state, "Notwithstanding paragraph (ii)," expenses incurred by the producer in the sale or transfer of production to a third party before the point of valuation are deductible in determining fair market value. Had the legislature intended these provisions to have the meaning Kennedy urges this Court to adopt, it easily could have added language necessary to accomplish that result.

[¶ 16] Kennedy contends that it did not bear the costs of transporting the gas from the point of sale to the outlet of the initial dehydrator; therefore, the provision requiring valuation after the production process is completed did not apply. Kennedy points to John Kennedy's testimony that Kennedy did

not sell its gas at the wellhead for index prices but for index prices less a location differential. Essentially, Kennedy discounted the sales price of its CBM by the amount it cost the purchaser to gather and transport the gas from the wellhead downstream to the outlet of the initial dehydrator. This is simply another way of accounting for expenses incurred between the wellhead and the point of valuation. While other producers sold or transferred their gas to third parties who then charged the producer for gathering and transportation costs by invoice, Kennedy discounted its sale price to account for those costs. Regardless of how those expenses were reflected, whether by invoice or a discount on the sales price, Kennedy was not entitled to deduct expenses incurred prior to the outlet of the initial dehydrator.

[¶ 17] Reading all of the provisions together, it is clear the DOR properly determined the fair market value for Kennedy's CBM at the outlet of the initial dehydrator after the sale or transfer to Enron and others. The plain language of subsection (b)(v) simply provides that the fair market value will be "established by" bona fide arms length transaction, not that the point of valuation is different than that applicable to sales occurring downstream of the dehydrator. In context, this approach makes sense when compared to the use of measures other than the actual transactions downstream from the point of valuation, e.g. comparable value, comparable sales, net back and proportionate profits, all of which are proxies for the actual costs intended to assure fair market value when the producer does its own transportation and processing. When sales occur upstream from the initial dehydrator, the fair market value of the production is the value established by the bona fide arms-length sales price and the bona fide arms-length expenses incurred in getting the CBM from the wellhead to the outlet of the initial dehydrator. Because those expenses are due to activities which occurred before the outlet of the initial dehydrator, the production process is not complete when they are incurred. The point of valuation remains the point at which the production process is complete and the fair market value of Kennedy's gas includes those expenses incurred prior to that point.

[¶ 18] In *RME Petroleum*, ¶ 48, 150 P.3d at 690, we said:

> Statutes levying taxes should not be extended, by implication, beyond the clear import of the language used, or their operations enlarged to embrace matters not specifically addressed. Article 15, Section 13 of the Wyoming Constitution requires that "every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied." We believe the legislature is well acquainted with the need to draw its tax statutes carefully and with precision.

The legislature specified that gas is to be valued at the point where production is completed; production is completed after any activity occurring prior to the outlet of the initial dehydrator. If the legislature had intended the point of valuation to change with circumstances occurring upstream from the outlet of the initial dehydrator, we would expect to see that intent clearly reflected in the language of the statute. *Id.*

[¶ 19] Kennedy claims that the legislature adopted the mineral valuation statutes with conventional gas wells in mind, before CBM production was contemplated. In the context of conventional gas production where dehydrators were ordinarily located at or near the well, the point where the production process was completed, the point of valuation and point of sale were all at the same location. Kennedy asserts that with the advent of CBM production, where the dehydrators may be located miles downstream from the wellhead, the statutes require a different interpretation because in that context the point of valuation may be downstream from the point of sale.

[¶ 20] While we do not dispute that CBM production may differ somewhat from conventional production, our task is limited to determining legislative intent where possible from the language used in the statute. Absent finding the language ambiguous, we do not resort to rules of construction. We have concluded the language clearly and unambiguously provides that the point of valuation for gas is at the outlet of the initial dehydrator. If the legislature disagrees with that

conclusion it is free to amend the statute. Courts, however, are not free to legislate.

[¶ 21] As Appendix 3 to its brief, Kennedy attached a joint revenue interim committee report and narrative discussing draft mineral taxation legislation. The DOR filed a motion to strike the attachment on the grounds that it was not introduced into evidence in the proceedings before the Board, the State had no opportunity to object to the report and it is not proper evidence of legislative intent. We denied the motion. In its brief, the DOR renews its argument that the documents are improper and should be disregarded by this Court. The DOR cites our precedent holding that the intent of an individual legislator is not proper evidence of legislative intent. *Greenwalt v. Ram Rest. Corp. of Wyo.*, 2003 WY 77, ¶ 52, 71 P.3d 717, 735 (Wyo.2003).

[¶ 22] The documents to which the DOR objects are not the statements of an individual legislator. The documents consist of: 1) a mineral taxation report from a joint interim revenue committee charged by the legislature with recommending statutory language to define the point at which minerals are to be valued for taxation purposes, and 2) a narrative explaining the mineral taxation bill the committee recommended to the legislature.[3] We have considered similar materials when determining the legislature's intent in enacting statutes. *Parker Land and Cattle Co. v. Wyo. Game and Fish Comm'n*, 845 P.2d 1040, 1050 (Wyo.1993). While generally we do not consider such materials when the statutory language is clear, on occasion we have departed from the general rule. We do so here because we are persuaded that our "inquiry benefits from reviewing additional information rather than ignoring it." *Id.* (citation omitted).

[¶ 23] Having reviewed the materials contained in Appendix 3, we find nothing that changes our conclusion concerning the meaning of § 39–14–203. The report states that the committee's primary charge was to develop language clarifying the point of valuation for mineral production. The accompanying narrative describes "the heart of the bill" to be the paragraph defining *the point* of valuation as the point at which the production process ends. The narrative clarifies that there are four possible points of valuation for natural gas, including the initial dehydrator, and states that whichever occurs first is *the point* of valuation. Significantly, a point of sale prior to the initial dehydrator is not identified as one of the possible points of valuation. The report states, in very clear terms, "any and all expenses incurred by the producer to get the gas to the point of taxation *will not* be deductible when determining taxable value." In addition, the report indicates a clear intent to distinguish the point of valuation from the method of valuation stating:

> Although the directive of the Legislature only required the Committee to deal with the question of the Point of Taxation, it became evident that to accomplish what we felt was intended by the Legislature, the Committee needed to expand its discussion to the methods of valuing minerals as well. Early in its deliberations, the Committee decided to consider finding solutions to both topics—the "Point of Valuation" and the "Method of Valuation."
>
> [D]etermining the proper valuation method for natural gas was more involved, as natural gas is sold at different points, under

---

3. In 1989, the legislature enacted Wyo. Stat. Ann. § 39–2–201(f)(ii) requiring the joint revenue interim committee to review and make recommendations concerning Wyoming's mineral tax policy and to offer legislation for introduction in 1990 establishing the point of valuation for minerals under Wyo. Stat. Ann. § 39–2–202. 1989 Wyo. Sess. Laws, Ch. 204, 391–393. The mineral taxation report contained in Kennedy's Appendix 3 is the culmination of that effort. The interim committee submitted the report, a draft of a recommended bill (H.B. 149), and a narrative explanation of the bill's intent to the legislature and the governor. In addition to the committee's report, Appendix 3 contains the narrative explanation. H.B. 149 was enacted in 1990 as Wyo. Stat. Ann. § 39–2–208. In 1998, the legislature repealed § 39–2–208 and re-enacted it as § 39–14–203. Throughout this history, three important parts of the legislation have remained essentially unchanged: the fair market value of minerals for tax purposes is determined when the production process is completed; the production process for gas is complete after any activities occurring before the outlet of the initial dehydrator; and expenses the producer incurs prior to the point of valuation are not deductible in determining fair market value.

different circumstances. To allow for these different circumstances, the proposed legislation contains four statutory methods to value oil and gas (in addition to the bona fide arms-length transaction).

These statements from the report and narrative are consistent with the DOR's position and the express statutory language.

[¶ 24] The narrative does include language, which Kennedy relies on to support its position, describing § 39–14–203(b)(v) as "maintaining the integrity of arms-length transactions for sales at the wellhead or other places prior to the new points of [valuation] in H.B. 149" and suggesting that producers selling upstream of the point of valuation will only be taxed on what they receive, not on the costs of functions performed downstream of the point of sale. However, these isolated comments are contrary to the many statements made throughout the narrative that the point at which production ends is *the point* of valuation. It is also contrary to the committee's description of the recommended bill as representing a compromise between industry's position that taxable value should be determined at the wellhead and the DOR's position that it should be determined at the point of sale or the processing plant inlet. Noting that these differing positions could result in the point of taxation moving from one place to another depending on the circumstances, the interim committee "attempted to define a point where the mineral is considered produced. Once set, the producer has the responsibility for all expenses to get the mineral to that point."

[¶ 25] In its report, the interim committee also referenced the Wyoming constitutional provisions requiring that all property shall be uniformly valued and all taxation shall be equal and uniform. Wyo. Const. Art. 15, §§ 3, 11. The committee commented that it had these provisions in mind in working to draft legislation that would satisfy the constitutional requirements. The committee's emphasis throughout its report and narrative on establishing *the* point of valuation for all natural gas production is consistent with its recognition of the uniformity requirement

[¶ 26] Like the narrative, neither the report nor the actual legislation contains clear language to effectuate a different treatment of gas sales prior to the point of valuation. Instead the all-encompassing language defining the end of production as "after extracting, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator" makes it clear that is the point of valuation. To give effect to all paragraphs of § 39–14–203, paragraph (b)(v) can reasonably be interpreted to mean only that while bona fide arms-length transactions shall be used to establish fair market value when gas is sold before production is completed, expenses the producer incurs prior to the point of valuation remain non-deductible because they are part of the production process.

[¶ 27] In response to Kennedy's suggestion that CBM production is different from conventional gas production prevalent at the time the legislature adopted the statutes in question, we note that the interim committee's report specifically recognizes that the "diversity in methods of producing gas" is one of the reasons it recommended a specific point of taxation. Because we find the plain language of § 39–14–203(b) to be clear and unambiguous, and the limited legislative history not inconsistent with that language, we must conclude the legislature intended to establish one clear point of valuation for mineral taxation purposes. If we are incorrect in discerning that intent, we are certain the legislature will act to clarify itself.

## CONCLUSION

[¶ 28] Section 39–14–203(b)(ii) clearly and unambiguously provides that the fair market value for gas is determined after the production process is complete. Paragraph (b)(iv) further provides that the production process for gas is completed after it is extracted from the well, gathered, separated, injected and any other activity which occurs before the outlet of the initial dehydrator. Under the clear language of paragraph (b)(ii), producer expenses incurred prior to the point of valuation, i.e. the outlet of the initial dehydrator, are not deductible. The DOR properly determined the fair market value of Kennedy's

CBM production after the production process was complete and disallowed expenses Kennedy incurred before the outlet of the initial dehydrator.

[¶ 29] Affirmed.