2010 WY 37

**Julie McClain MORRIS, Appellant
(Plaintiff),**

v.

**CMS OIL AND GAS COMPANY,
Appellee (Defendant).**

**CMS Oil and Gas Company,
Appellant (Defendant),**

v.

**Julie McClain Morris, Appellee
(Plaintiff).**

Nos. S–08–0103, S–08–0104.

Supreme Court of Wyoming.

March 25, 2010.

Representing Julie McClain Morris: Patrick G. Davidson and Rebecca L. Winkler of Daly Law Associates, LLC, Gillette, Wyoming. Argument by Mr. Davidson and Ms. Winkler.

Representing CMS Oil and Gas Company: Thomas F. Reese, Drake D. Hill and Orintha E. Karns of Brown, Drew & Massey, LLP, Casper, Wyoming. Argument by Mr. Reese.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] Julie McClain Morris owns an overriding royalty interest in gas wells operated by CMS Oil and Gas Company (CMS). Believing CMS was not properly reporting production or paying her royalties, Ms. Morris brought suit under the Wyoming Royalty Payment Act (WRPA), Wyo. Stat. Ann. § 30–5–301 thru 30–5–305 (LexisNexis 2009). After a bench trial, the district court found that CMS ultimately had paid the royalties due Ms. Morris but in some instances had not complied with the WRPA, by either not timely paying them to her or placing them in escrow and by not reporting production as required. The district court imposed reporting penalties against CMS and awarded both parties attorney's fees.

[¶ 2] Ms. Morris appealed the district court judgment and CMS cross appealed. Ms. Morris asserts the district court erred in awarding CMS attorney's fees, applying the reporting penalty, finding that CMS had paid the royalties due and properly reported production and applying the WRPA escrow provision. CMS contends the district court erred in concluding it failed to properly report and awarding Ms. Morris attorney's fees. We affirm in part, reverse in part, and remand for further proceedings.

## ISSUES

[¶ 3] In appeal No. S–08–0103, Ms. Morris presents the following issues:

A. Did the district court err in awarding attorney's fees and costs to the non-prevailing party?

B. Did the district court err in applying the $100.00 penalty set forth in Wyoming Statute § 30–5–303(c)?

C. Did the district court err in refusing to award damages to [Ms. Morris] for the non-payment of royalties?

D. Did the district court err in finding [CMS] properly reported production to [Ms. Morris]?

E. Did the district court err in its application of the safe-harbor provision found in the Act.

In appeal No. S–08–0104, CMS presents the following two issues:

1. Was the award of any reporting penalties under the Wyoming Royalty Payment Act (WYO. STAT. ANN. § 30–5–301, *et seq.*) improper?

2. Did [Ms. Morris] improve her position through litigation, so as to allow her to be a prevailing party for any portion of the case?

## FACTS

[¶ 4] Ms. Morris owns overriding royalty interests in minerals located in northeastern Wyoming. From April of 1999 until May of 2002, CMS produced minerals and operated wells in which Ms. Morris had an overriding royalty interest. CMS first sold production from the wells in December of 1999. CMS obtained title opinions that listed Ms. Morris as a presumed holder of overriding royalty interests, but also reflected problems with her title. Because of the title problems, CMS did not consistently pay her or place the funds in escrow as required by the WRPA.

[¶ 5] In March of 2002, Ms. Morris filed a complaint in which she claimed that CMS had violated the WRPA by failing to timely pay her for production or, alternatively, pay the amounts due into an escrow account, and by failing to properly report production.[1]

---

1. Ms. Morris also named Pennaco Energy, Inc. (Pennaco) as a defendant. At the time she filed her complaint, Pennaco and CMS each owned roughly 50% of most of the wells at issue. In May of 2002, CMS sold its interest to Pennaco. Ms. Morris and Pennaco reached a settlement and Pennaco was dismissed from the action prior to trial.

In addition to her claims under the WRPA, Ms. Morris asked for an accounting and alleged claims for breach of the covenant of good faith and fair dealing, unjust enrichment, and conversion. The district court held the WRPA gave Ms. Morris a statutory cause of action that supplanted her common law claims. Ms. Morris did not

CMS answered the complaint generally denying the claims. The parties proceeded with discovery and, in September of 2005, CMS filed a motion for summary judgment.[2] In deciding the motion, the district court summarized the parties' respective positions as follows:

> Succinctly put, despite the plethora of pleadings to date, the process has culminated with the parties unable to agree on substantive matters. [CMS's] argument … is a straightforward one: it argues that upon discovery of defects in [Ms. Morris's] title to certain leases it escrowed royalty payments and assisted [Ms. Morris] in curing such defects. Once defects in [Ms. Morris's] title were cured, it timely paid all sums owed to [her], and thus has no liability.

> [Ms. Morris's] response is that after three years of legal wrangling [CMS] still owes her $9,367.64 in royalties and late payment interest, plus court costs and attorney's fees, plus reporting penalties which—according to her method of calculation—total millions of dollars.

After considering the parties' briefs, supporting documents and arguments, the district court determined questions of fact existed as to whether CMS owed Ms. Morris royalty payments and violated the WRPA and it denied the motion.

[¶ 6] The district court convened a three day bench trial. The district court subsequently issued a decision finding that Ms. Morris had failed to prove that CMS owed her additional royalty payments and, although a preponderance of the evidence tended to show that CMS did not fully comply with the WRPA prior to escrowing funds in April of 2002, a preponderance of the evidence also showed that CMS had actually overpaid her by the time of trial. The district court concluded that CMS violated the WRPA prior to paying the funds into escrow and Ms. Morris would not have been paid had she not brought legal action, however CMS had paid her in full as of November 25, 2002—the date of the last escrow payment. The district court also found that CMS did not submit the reports required by the WRPA and imposed the statutory penalty for failure to report. For reasons that will be explained in subsequent paragraphs, the district court awarded Ms. Morris attorney's fees up to the date that CMS had paid her the royalty amounts due in full, and awarded CMS attorney's fees from that point through trial.

## DISCUSSION

### 1. Royalty Payments

[¶ 7] Ms. Morris asserts CMS did not properly pay her royalties and the district court's finding that it did is incorrect. Consideration of this issue, as well as the other issues presented, requires an understanding of the WRPA. The provisions of the WRPA governing payment for production state in pertinent part as follows:

**§ 30–5–301. Payment for production; time for payment; payor.**

(a) The proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in the state of Wyoming shall be paid to all persons legally entitled thereto, except as hereinafter provided, commencing not later than six (6) months after the first day of the month following the date of first sale and thereafter not later than sixty (60) days after the end of the calendar month within which subsequent production is sold, unless other periods or arrangements for the first and subsequent payments are provided for in a valid contract with the person or persons entitled to such proceeds. Payments shall be made directly to the person or persons

---

appeal the district court's ruling on her common law claims.

2. In its November 2, 2005, decision letter on CMS's motion for summary judgment, the district court described what had occurred in the intervening two and a half years as follows:
   [Ms. Morris and CMS] have engaged in a surfeit of pleadings, motions, and responses now accounting for more than four feet of the Campbell County Clerk of Court's shelving space. The matter immediately at hand stems from the September 16, 2005 filing by [CMS] of its Motion for Summary Judgment … and the accompanying, heavily-exhibited … memorandum. [Ms. Morris] filed her equally exhibit-laden [response] on October 5, 2005.

entitled thereto by the lessee or operator or by any party who assumes such payment obligation under any legal arrangement.

. . . .

### § 30–5–302. Payment for production; interest on late payments.

Any delay in determining any person legally entitled to an interest in the proceeds from production shall not affect payments to all other persons entitled to payment. In instances where payment cannot be made for any reason within the time limits specified in W.S. 30–5–301(a), the lessee or operator; purchaser or other party legally responsible for payment shall deposit all proceeds credited to the eventual interest owner to an escrow account in a federally insured bank or savings and loan institution in Wyoming. . . . Payment of principal and accrued interest from such accounts shall be paid by the escrow agent to all persons legally entitled thereto within thirty (30) days from the date of receipt by the escrow agent of final legal determination of entitlement thereto. . . .

### § 30–5–303. Payment for production; penalty for violation; jurisdiction; costs and fees.

(a) Any lessee or operator, purchaser or other party legally responsible for payment who violates the provisions of this article is liable to the person or persons legally entitled to proceeds from production for the unpaid amount of such proceeds, plus interest at the rate or eighteen percent (18%) per annum on the unpaid principal balance from the due date specified in W.S. 30–5–301(a).

(b) The district court for the county in which a well producing oil, gas or related hydrocarbons is located has jurisdiction over all proceedings brought pursuant to this article and the prevailing party in any proceedings brought pursuant to this article shall be entitled to recover all court costs and reasonable attorney's fees.

[¶ 8] Pursuant to these provisions, CMS was required to pay the proceeds from the sale of production to those legally entitled within six months after the first day of the month following the date of first sale and thereafter not later than sixty days from the end of the calendar month in which subsequent production was sold. Section 30–5–301(a). In the event it could not determine who was legally entitled to these proceeds, CMS was required to deposit the proceeds into an approved escrow account and, failing that, was required to pay a penalty of 18% interest on the unpaid balance. Sections 30–5–302, 30–5–303(a).

[¶ 9] From the evidence presented at trial, the district court found that CMS began producing coal bed methane from the leases in April 1999. The first sale of production occurred in December of 1999. Pursuant to § 30–5–301(a), CMS was required to pay Ms. Morris by June of 2000.[3] However, the district court found that Ms. Morris did not begin receiving royalty payments until November 24, 2000. CMS also did not escrow any funds during the period from June to November of 2000. The district court found that CMS suspended payments to Ms. Morris again on January 29, 2002; however, CMS did not deposit funds into an escrow account until April 8, 2002.

[¶ 10] In spite of finding that CMS failed either to timely make payments to Ms. Morris or into an escrow account, the district court concluded that ultimately CMS had paid Ms. Morris all she was due. The district court based this conclusion on the following findings: CMS had paid Ms. Morris $7,054.76 in royalties before it suspended payments on January 25, 2002; CMS deposited $28,139.86 in the escrow account on April 8, 2002; CMS instructed the bank to distribute funds to Ms. Morris on September 18, 2002, and on September 30, 2002, the bank sent Mrs. Morris a check for $25,871.94; on October 11, 2002, CMS instructed the bank to distribute additional funds and on November 25, 2002, the bank sent Ms. Morris a check for $5,730.71. The district court further found from the evidence presented that Ms. Morris failed to meet her burden of

---

**3.** The district court found that CMS "suspended payments" to Ms. Morris on or about January 12, 2000. The basis for this finding is unclear given that CMS was not required to pay her until June of 2000, six months from the date of first sale, which was December of 1999.

proving that she was owed any more than the $38,657.41, either in royalties or as interest on the amounts CMS failed to timely pay or escrow.

[¶ 11] Ms. Morris's principal claim on appeal is that the district court's findings are clearly erroneous because there was no way for her, or the court, to determine from CMS's records whether she was properly paid. She contends CMS did not provide the documentation necessary to make that determination and the documentation it did provide was unreliable. She claims CMS's after the fact revisions and overstatements of payments further contributed to the problem of determining whether she was properly paid. She also asserts CMS's own expert witness testified she was not paid royalties on some wells.

[¶ 12] The following principles govern our review of a district court's determinations following a bench trial:

> "The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

With regard to the trial court's findings of fact,

> "we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law."

The district court's conclusions of law, however, are subject to our *de novo* standard of review.

*Lieberman v. Mossbrook*, 2009 WY 65, ¶ 40, 208 P.3d 1296, 1308 (Wyo.2009) (citations omitted).

[¶ 13] Viewing the evidence in accordance with the above principles, we uphold the district court's determination that Ms. Morris failed to prove she was owed royalties or interest beyond the $38,657.41 CMS had paid as of November 2002. Ms. Morris presented no evidence proving the royalty amount she was owed. Ms. Morris expressly testified she was unsure of the amount but that her expert would know. Her expert testified that, while there were some irregularities in the reports, they ultimately resolved themselves. The only actual discrepancies he found were accounted for by direct payments from CMS to creditors of Ms. Morris who had acquired an interest in her royalty payments. Thus, Ms. Morris failed to prove that she was entitled to additional royalty payments beyond those CMS had made to her as of November of 2002.

[¶ 14] Turning to Ms. Morris's claim that she was unable to prove her damages because of CMS's actions, we address first her contention that she could not prove her damages because CMS refused to produce the necessary documentation during discovery. Evidence was presented supporting a conclusion that Ms. Morris was granted access to all the documentation that CMS had generated concerning her royalty interests. CMS made the materials available to Ms. Morris at offices in Denver, Colorado, and Casper, Wyoming. Additionally, CMS's expert testified he provided Ms. Morris's expert all pertinent material he had in his possession and Ms. Morris's expert acknowledged the same.

[¶ 15] Ms. Morris asserts the documentation CMS provided was unreliable. She relies heavily on an internal CMS memorandum dated April 20, 2001. The memorandum states that internal research into production information had revealed incorrect first dates of sale and/or volume numbers for approximately thirty wells reported between August 2000 and November 2000. On this basis, Ms. Morris asserts that the

production numbers for all 221 wells in which she has an interest, at all pertinent times, were untrustworthy. We are not convinced. The memo reflects an effort by CMS to ensure the accuracy of its production numbers and suggests that the mistakes identified were corrected. In addition, a large portion of the memorandum is devoted to explaining the remedial measures that had already been put into place and the remedial measures that would be put into place in the near future to ensure accurate reporting. Thus, while this memorandum discloses CMS had some initial problems with its reporting on some wells it does not prove that the information CMS ultimately provided was unreliable.

[¶ 16] Ms. Morris also argues that CMS's production numbers as reported to her were unreliable because they did not match the production numbers reported to the Wyoming Oil and Gas Conservation Commission (WOGCC) as reflected on the WOGCC website. One difficulty with this assertion is that the WOGCC website includes a disclaimer that its numbers should not be relied upon. Additionally, CMS's expert testified certain of the WOGCC website numbers were incorrect because CMS had revised some production figures reported to the WOGCC down to zero and submitted the revised production report to the WOGCC which were not reflected on the website. Rather than substantiating Ms. Morris's claim that CMS's numbers were unreliable, the evidence suggested only that the WOGCC numbers Ms. Morris relied upon were not reliable.

[¶ 17] Ms. Morris's final argument concerns the wells for which she never received reporting or payment. Her expert testified he found approximately thirty-three wells for which she had never received payment. He was never asked to calculate the royalty amount due on those wells. He made a quick calculation and guessed the "royalty interest would be probably less than $500." CMS's expert testified only three such wells existed. He testified the production numbers including the volumes calculated for these wells by Ms. Morris's expert were correct. No competent evidence on the sales price of this production, however, was ever

presented. Again, the record supports the district court's conclusion that Ms. Morris failed in her burden of proof.

[¶ 18] Having examined all of the properly admissible evidence, we uphold the district court's conclusion that CMS ultimately paid Ms. Morris more than she was due. Viewing the evidence in the light most favorable to CMS and giving due regard to the district court's opportunity to assess the credibility of the witnesses, we are not left with the definite and firm conviction that a mistake has been committed. The district court's findings are not clearly erroneous.

## 2. Lack of Reporting

[¶ 19] The reporting provision of the WRPA states in pertinent part as follows:

**§ 30–5–305. Collection; reporting and remittance of royalties.**

. . . .

(b) Whenever payment is made for oil or gas production to an interest owner, all of the following information shall be included and labeled on the check stub or on an attachment to the form of payment, unless the information is otherwise provided on a regular monthly basis:

(i) The lease, property or well name or any lease, property or well identification number used to identify the lease property or well;

(ii) The month and year during which sales occurred for which payment is being made;

(iii) The total number of barrels of oil or thousands of cubic feet of gas sold;

(iv) The price per barrel of oil or the price per thousand cubic feet of gas;

(v) The total amount of state severance, ad valorem and other production taxes;

(vi) An itemized list of any other deductions or adjustments;

(vii) The net value of total sales after deductions;

(viii) The owner's interest in sales from the lease, property, or well expressed as a decimal;

(ix) The owner's share of the total value of sales prior to any deductions;

(x) The owner's share of the sales value less deductions; and

(xi) An address where additional information pertaining to the owner's interest in production may be obtained and questions answered. If information is requested by certified mail, an answer must be mailed by certified mail within thirty (30) days of receipt of the request.

[¶ 20] The penalty for failing to report as required in the above provision is set out in § 30–5–303(c) as follows:

Any person who fails to provide royalty information as provided in W.S. 30–5–305(b) is liable to the affected royalty, overriding royalty or other nonworking interest owner in the amount of one hundred dollars ($100.00) per month that complete reporting is not provided to the interest owner.

[¶ 21] The district court concluded that the plain language of the WRPA did not require CMS to report when the funds were being held in escrow. The district court reasoned: "This makes perfect sense, because one who is uncertain regarding whom to pay or how much to pay can hardly be expected to report accurately."

[¶ 22] The district court continued:

Each party presented expert testimony at trial in an attempt to prove its central contention. [Ms. Morris] attempted to portray herself as an innocent interest holder whose royalties were unlawfully withheld by [CMS], who was also in violation of the Act's reporting requirements. [CMS] attempted to portray itself as a diligent lessee more than willing to pay the royalties, but confused as to the identity of the interest holder and therefore justified in withholding payment. Neither position is entirely accurate.

Much of the testimony at trial concerned blow-by-blow descriptions of the cause and effect of various problems with [Ms. Morris's] title. In the court's eye, however, much of that testimony was superfluous. As the statute makes clear, producers of oil and gas must timely pay royalties to interest holders. If for *any reason* the making of timely payments is not feasible, producers must escrow the royalties in question while the problem—be it *whom* to pay or *how much* to pay—is sorted out. In the matter at bar, there can be no question that with respect to the majority of wells [CMS] knew *whom* to pay—its own title opinions indicated that much. In the majority of instances the question was with respect to the *amount* to be paid. The uncontroverted evidence was that on the vast majority of producing wells, [CMS] knew that [Ms. Morris] had at least some interest.

Similarly, in those instances where a genuine question regarding the identity of the interest holder arose, [CMS] should have immediately escrowed the funds in question.... [I]t is manifest that while the wells were producing, [CMS] should have been paying *someone;* the Act and later Supreme Court interpretations make clear that if the identity of the royalty interest holder is an issue the funds should be escrowed immediately.

(Emphasis in original) The district court concluded as a matter of law that CMS violated the WRPA by failing to submit the required reports for twenty-nine months; accordingly, the court imposed a penalty of $2,900.

[¶ 23] Both parties appealed the district court's conclusion. Ms. Morris asserts the district court erred in finding CMS properly reported production while CMS contends the district court correctly found that it fully and accurately reported but erred in awarding reporting penalties. Neither of these assertions makes sense in light of the district court's conclusion. The district court did not conclude that CMS properly reported; rather, the district court concluded that CMS failed to properly report for twenty-nine months. Neither party challenges the district court's finding that CMS failed to report during the specified time period, or argues that this finding was not supported by the record.

[¶ 24] Ms. Morris challenges the manner in which the district court applied the reporting penalty. Ms. Morris asserts that § 30–5–303(b) requires producers to submit a report for each well and failing to do so are subject to a $100 penalty per month per well.

The district court concluded the statute required a producer to submit a complete report each month to the interest holder and the failure to do so would result in a penalty of $100 for each month complete reporting did not occur. In reaching this result, the district court concluded the language of the statute was clear and unambiguous; § 30–5–305 provided for reporting by "lease, property or well name," meaning a producer complied by sending the interest owner one report per month detailing production on all wells on a particular lease in which the owner had an interest; and to construe § 30–5–303(c) as Ms. Morris asserted would require adding words the legislature omitted as follows:

> Any person who fails to provide royalty information as provided in W.S. 30–5–305(b) is liable to the affected royalty, overriding royalty or other nonworking interest owner in the amount of one hundred dollars ($100.00) *per well* per month that complete reporting is not provided to the interest owner.

[¶ 25] Applying the usual rules of statutory construction, the district court declined to construe the WRPA as requiring one report *per well* per month. The district court likewise rejected Ms. Morris's claim that the $100 penalty should be compounded each month no report was submitted, concluding instead that the provision means what it says: a producer who fails to submit a complete monthly report is liable to the interest owner in the amount of $100 per month.

[¶ 26] Our review of statutory provisions is governed by the following standards:

> The paramount consideration is to determine the legislature's intent, which must be ascertained initially and primarily from the words used in the statute. We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. If we deter-

mine that a statute is clear and unambiguous, we give effect to the plain language of the statute.

*Kennedy Oil v. Dep't of Revenue*, 2008 WY 154, ¶ 10, 205 P.3d 999, 1003 (Wyo.2008) (citations omitted). Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court. *Id.*

[¶ 27] Looking at the language of § 30–5–305(b) as set out in paragraph 19 above, the clear intent of the legislature was that interest owners would receive all of the information identified in subparagraphs (i) through (xi) on a regular monthly basis. The provision does not require the information to be provided on a per well basis but instead authorizes the information to be provided *by lease, property or well.* For example, § 30–5–305(b)(viii) requires the report to include "the owner's interest in sales from the lease, property, or well . . . ." The legislature's further intent was that anyone who failed to provide the information required in § 30–5–305(b) would be liable to the interest owner in the amount of $100 for each month that a complete report was not provided.

[¶ 28] Given the clear language of § 30–5–303(c), we agree with the district court's conclusion that the legislature did not intend to impose the $100 per month penalty for each well; had that been its intent, it would have said so. As this Court has said, the omission of words from a statute is considered to be an intentional act by the legislature and we will not read words into a statute when the legislature has chosen not to include them. *Kennedy,* ¶ 14, 205 P.3d at 1004. When statutory words are clear and unambiguous, a court risks an impermissible substitution of its own views, or those of others, for the intent of the legislature if any effort is made to interpret or construe statutes on any basis other than the language invoked by the legislature. *Id.* The district court correctly determined that CMS was liable to Ms. Morris in the amount of $100 for each month that it failed to submit a complete report.

[¶ 29] Ms. Morris also contends the district court erred in concluding that the $100 per month reporting penalty was not cumula-

tive. By calculating the $100 per month penalty per well and then adding the penalty for each preceding month to the next month, Ms. Morris has asserted throughout these proceedings that CMS owed her $2,208,500. We conclude that the district court correctly determined from the plain language of the statute that the legislature intended to impose a maximum penalty of $100 for each month complete reporting did not occur. Nothing in the statutory language suggests otherwise.

[¶ 30] CMS asserts in its cross appeal that the district court erred in awarding reporting penalties under the WRPA. CMS contends that Ms. Morris presented no evidence showing the specific months when it failed to report and the district court made no finding in that regard. Given the lack of evidence and findings, CMS asserts, the reporting penalties awarded were based upon speculation.

[¶ 31] Contrary to CMS's assertions, Ms. Morris presented evidence that CMS did not submit reports for numerous wells in which she asserted a royalty interest. Additionally, her expert witness identified thirty-three wells in which she had an interest but received no report. On the basis of the evidence, the district court found that CMS should have submitted reports "beginning in November 1999, which is six months after the start of production in April, 1999" and continuing "from that point forward through March 2002...." Concluding that CMS failed to report for that twenty-nine month period, the district court ordered CMS to pay $2,900 in reporting penalties.

[¶ 32] The evidence presented at trial supports the district court's determination that CMS failed to submit complete monthly reports from July of 2000 through March of 2002. However, we are puzzled by the district court's finding that CMS was required to report beginning in November of 1999. Section 30–5–301 requires payment within six months after the first day of the month following the first day of sale. Section 30–5–305(b) requires reporting on a regular monthly basis once payment commences. The first sale was in December of 1999. Therefore, it appears the first payment-and the first report-was due six months after January 1, 2000, that is, July of 2000. On remand, the district court should consider this issue and determine the proper penalty.

### 3. Attorney's Fees and Costs

[¶ 33] The district court concluded that Ms. Morris was the prevailing party until November 25, 2002, the date CMS paid her royalties in full. The court reached this conclusion because it was "convinced that [Ms. Morris] would not have received her royalty interests had she not commenced litigation" and "there can be no doubt that she improved her position through this litigation." However, the district court also concluded that CMS had paid Ms. Morris's royalties by November 25, 2002, and after that date the proceedings were limited to calculating reporting penalties, costs and attorney's fees. On those issues the district court concluded CMS was the prevailing party from November 26 forward. The court awarded Ms. Morris attorney's fees and costs of $7,638.37. It awarded CMS $277,450.40 in attorney's fees and $6,946.03 in costs for a total of $284,396.43.

[¶ 34] Both parties appealed the district court's ruling. Ms. Morris claims the district court erred in awarding CMS costs and fees. CMS contends the district court improperly found Ms. Morris to be the prevailing party from March to November 2002 and that decision should be reversed.

[¶ 35] In considering claims for attorney's fees, Wyoming follows the American Rule pursuant to which each party is responsible for his or her own attorney's fees in the absence of an express contractual or statutory provision to the contrary. *Stafford v. JHL, Inc.*, 2008 WY 128, ¶ 16, 194 P.3d 315, 318 (Wyo.2008). In this case, the award of attorney's fees is addressed expressly in § 30–5–303(b), which provides as follows:

(b) The district court for the county in which a well producing oil, gas or related hydrocarbons is located has jurisdiction over all proceedings brought pursuant to this article and the prevailing party in any proceedings brought pursuant to this arti-

cle shall be entitled to recover all court costs and reasonable attorney's fees.

Pursuant to this provision, in deciding the motions for attorney's fees, the district court correctly focused on the question of which party was the "prevailing party."

▮ [¶ 36] The determination of whether a party is a prevailing party is one of law, which we review *de novo*. *Veile v. Bryant*, 2005 WY 150, ¶ 7, 123 P.3d 562, 564–65 (Wyo. 2005). We have defined "prevailing party" for purposes of awarding costs of litigation as one who "improves his or her position by the litigation." *Id.*, ¶ 9, 123 P.3d at 565 (quoting *Schaub v. Wilson*, 969 P.2d 552, 561 (Wyo. 1998)).

[¶ 37] We have applied the definition of "prevailing party" in other cases. In *Veile*, for example, Mr. Veile filed a complaint with a State Board. The Board dismissed the complaint after finding no basis for the claims. Mr. Veile sought review in district court. The district court concluded it did not have jurisdiction and dismissed the petition. Mr. Veile then sought review in this Court. We concluded the district court did have jurisdiction and reversed the district court's judgment. Proceeding to address the merits of Mr. Veile's claims, we upheld the Board's ruling. When Mr. Veile sought to recover litigation costs, the district court denied his motion and we affirmed on the ground that Mr. Veile had not improved his position through the litigation; therefore, he was not the prevailing party and was not entitled to recover his costs.

[¶ 38] We determined in *Schaub*, 969 P.2d at 561, that the district court properly exercised its discretion in finding that the plaintiff in an action arising out of a motor vehicle accident was not the prevailing party for purposes of awarding costs. There, the plaintiff obtained a default judgment against the defendant after he failed to answer the complaint. *Id.* at 555. In a subsequent hearing on damages, however, the district court concluded the plaintiff's injuries were not caused by the accident. *Id.* Because the plaintiff failed to prove the accident was the proximate cause of her injuries, we upheld the district court's determination that she did not improve her position through litigation,

was not the prevailing party and was not entitled to recover her costs. *Id.* at 561.

[¶ 39] One other case merits discussion. In *Crawford v. Amadio*, 932 P.2d 1288 (Wyo. 1997), the defendant made an offer of judgment prior to trial, which the plaintiff did not accept. The case went to trial and the jury awarded less than the offer of judgment. The district court awarded the plaintiff litigation costs up to the time of the offer and awarded the defendant costs from that point forward.

[¶ 40] This Court upheld the district court's division of costs between the parties on the basis of Wyo. Stat. Ann. § 1–14–124 (1988) and W.R.C.P. 54(d), which provided that a prevailing party was entitled to payment of costs "except when express provision therefor is made either in a statute or in these rules," and W.R.C.P. 68, which provided that a party who rejected an offer of judgment and then obtained a judgment less favorable than the offer of judgment was required to pay the costs incurred after the offer was made. Reading Rule 68 as an "express provision [for costs] made in these rules" as referenced in § 1–14–124 and Rule 54, the district court, and this Court, concluded Rule 68 governed and the plaintiff was required to pay the costs incurred after the offer of judgment was made. Had CMS made, and Ms. Morris rejected, an offer of judgment prior to trial for more than the amount of the judgment she obtained, Ms. Morris would have been required to pay the costs incurred after the offer was made. CMS made no such offer and so *Crawford* does not apply.

▮ [¶ 41] With this precedent in mind, we turn to the district court's conclusion that Ms. Morris was the prevailing party in this case. The evidence showed CMS knew from the title opinions it had obtained that Ms. Morris had some overriding royalty interest, but did not make payments to her or place the funds in escrow for the five month period from July to November of 2000 and again from January 29 to April 8, 2002. Thus, Ms. Morris prevailed on the issue that CMS failed to pay her or escrow the payments as required by the WRPA. The evidence also

showed that from July of 2000, six months after the first sale of production, until April 8, 2002, when CMS placed funds in escrow, CMS failed to provide reports to Ms. Morris as the WRPA required. Thus, Ms. Morris prevailed on that issue as well.

[¶ 42] In addition, the district court was convinced that Ms. Morris would not have received her royalty payments had she not filed this action. We are not persuaded the district court's finding in that regard was clearly erroneous. Ms. Morris filed this action on March 26, 2002. On April 8, 2002, CMS deposited funds into the escrow account. Eight months later, CMS made the first of two payments to Ms. Morris from the account. Over the course of the next two years, the district court was inundated with motions, responses and supporting documentation. The district court considered the parties' respective summary judgment motions, briefs and arguments and issued a lengthy ruling. It then heard three days of testimony, during which it had the opportunity to observe the witnesses, consider their credibility and weigh their testimony. After the trial, the district court issued another lengthy ruling along with the judgment. The district court was in the best position to assess whether Ms. Morris would have been paid if she had not filed suit, there is nothing in the record to suggest its assessment was clearly erroneous, and we will not disturb it on appeal.

[¶ 43] Unlike the claimants in *Veile* and *Schaub*, Ms. Morris did improve her position through litigation. She obtained payments she otherwise would not have, proved that CMS violated the WRPA and obtained a judgment requiring CMS to pay reporting penalties. For its part, CMS responded to Ms. Morris's legal action by immediately placing the funds in escrow and ultimately paying Ms. Morris the royalties due. As a consequence of the trial, CMS has a judgment against it finding that it violated the WRPA and requiring it to pay reporting penalties. We uphold the district court's determination that Ms. Morris improved her position through this litigation and was the prevailing party for purposes of attorney's fees. We turn next to Ms. Morris's claim

that the district court erred in awarding fees to CMS.

[¶ 44] Despite its findings that CMS failed to make payments and to report as the WRPA required and its further findings that Ms. Morris would not have been paid had she not filed legal action and improved her position through this action, the district court awarded Ms. Morris attorney's fees only from the time she filed the complaint in March of 2002 through the time that CMS finally made payment in full on November 25, 2002, eight months later. From that point forward, the district court awarded CMS attorney's fees. The district court apparently did so because Ms. Morris failed to prove her claim at trial that CMS owed more than it had already paid.

[¶ 45] As a matter of law, the district court's award of attorney's fees to CMS, when Ms. Morris was the prevailing party, cannot stand. The district court correctly concluded Ms. Morris was the prevailing party; CMS was not the prevailing party; § 30-5-303(b) authorizes an award of attorney's fees to the prevailing party; therefore, the district court erred in awarding CMS attorney's fees.

[¶ 46] In this case, the practical effect of the district court's award of attorney's fees to CMS was to punish Ms. Morris for not voluntarily dismissing her claim once CMS made some payment. Although hindsight may suggest that continuing to pursue the claim was imprudent, the record indicates that Ms. Morris pursued the case, in part, to obtain the information necessary to determine whether she was owed more than CMS had paid. Perhaps it would have been equally imprudent for her to have dropped her claim without having that information. Other procedures are available under the rules to encourage parties to accept bona fide settlement offers. *See* W.R.C.P. 68. Had CMS pursued those remedies it would have been entitled to recover its costs if Ms. Morris did not obtain a judgment greater than its offer. To punish Ms. Morris for pursuing the litigation and not accepting the amount CMS paid, without CMS having provided the required reports to allow her to determine whether she was being properly paid, runs counter to

the entire purpose of the WRPA as well as the express language of § 30–5–303(b) authorizing an attorney's fee award to the prevailing party. We reverse the district court's order awarding attorney's fees to CMS. On remand, the district court will be required to determine, in the exercise of its equitable discretion, the reasonableness of Ms. Morris's attorney's fees request for the period from November 22, 2002 through trial.

### 4. Application of the Escrow Provision

[¶ 47] In her final issue, Ms. Morris asserts the district court erred when it held CMS was not in violation of the WRPA once it escrowed the funds in April of 2002. She claims this ruling failed to take into account that there were some wells for which she never received payment or reports. In other words, Ms. Morris contends, the evidence showed that CMS was continuing to violate the WRPA after it escrowed the funds; therefore, the district court's calculation of the reporting penalty was incorrect.

[¶ 48] Ms. Morris is correct that the district court found that CMS did not specifically pay her for three wells in which she had an interest, and that there were likely other wells for which she was not paid. However, the district court also found that Ms. Morris's expert witness testified that he estimated the amount remaining unpaid at the time of trial was less than $500. This testimony, together with evidence CMS presented, tended to show that upon paying Ms. Morris the total sum of $38,657.41 as of November 25, 2002, CMS had paid approximately $3,000 more than it owed. In light of the testimony of Ms. Morris's expert that $500 remained unpaid, the district court's ruling was supported by the evidence.

### CONCLUSION

[¶ 49] The district court's conclusion that Ms. Morris received all the royalty payments she was due is supported by the evidence. The district court correctly concluded CMS failed to submit reports as required by the WRPA. The district court's conclusion that CMS violated the WRPA by failing either to pay Ms. Morris the royalties due or place them in escrow is supported by the evidence.

The district court correctly concluded Ms. Morris was the prevailing party and awarded her attorney's fees. The district erred in awarding CMS attorney's fees.

[¶ 50] The district court's ruling is affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.

KITE, J., delivers the opinion of the Court; GOLDEN, J., files a dissenting opinion.

GOLDEN, J., dissenting.

[¶ 51] I respectfully dissent from the majority opinion's conclusions regarding the reporting penalties and attorney's fees.

### Reporting Penalties

[¶ 52] I believe the majority opinion misses the primary mark on this issue. Despite the majority opinion's statement to the contrary, CMS expressly challenges the factual bases for the award of reporting penalties. In its appeal against the award for reporting penalties (S–08–0104), CMS argues the award of reporting penalties was purely speculative because Morris failed to prove with any specificity that any reporting penalties were due:

> Plaintiff did not attempt to prove the months when CMS allegedly failed to report or that it reported improperly in any specific month. The undisputed evidence is that CMS paid Plaintiff throughout the time period in question and that the check detail provided by CMS to Plaintiff provided all the information required by Wyo. Stat. Ann. § 30–5–305.

[¶ 53] In order to determine if Morris presented adequate proof to substantiate an award of penalties for lack of reporting for 29 months, it first must be determined when reports were due. Wyoming Statute § 30–5–305(b) unambiguously answers this question. Section 305(b) requires a report "[w]henever payment is made." My review of the record reflects that attached to every payment made is a check detail containing the requisite statutory information. Indeed, the disputes between Morris and CMS began with Morris

questioning some of the information contained in the check details. Finding no contrary evidence, I would hold that the district court's ruling that CMS failed to properly report clearly erroneous and reverse the same.

### Award of Attorney's Fees and Costs

[¶ 54] On this issue, I believe Morris was not the prevailing party for any purpose. The key to the resolution of this issue is the definition of "prevailing party." As the majority opinion correctly states, this Court has defined "prevailing party" as one who improves her position through litigation. The open question concerns the circumstances under which a party can be said to have improved her position through litigation. The obvious situation is where a judgment has been entered. This is what happened in both *Veile* and *Schaub*. The judgment was adverse to the appellants in both cases so it was obvious neither improved their position through litigation. The opposite is also true. A party that is awarded judgment in their favor clearly has improved her position through litigation.

[¶ 55] The less obvious situation is where a party has achieved success outside the courtroom. Under the so-called "catalyst theory," this party can also be deemed the prevailing party. The catalyst theory provides that parties are entitled to reasonable fees by demonstrating that their litigation was the catalyst for obtaining the relief sought, albeit in another venue such as through the defendant's voluntary change in conduct or via a private, non-judicial settlement agreement. When the district court in this case awarded Morris limited attorneys' fees because it determined Morris would not have received payment from CMS absent the filing of the instant legal action, it was relying on the catalyst theory.

[¶ 56] This Court has never expressly commented on the catalyst theory. Now that it is squarely before us, I would reject the catalyst theory because it runs contrary to the language and intent of Wyo. Stat. Ann. § 30–5–303(b). The American Rule reflects the common law rule. "When statutes are in derogation of the common law, they must be strictly construed and carefully adhered to." *State By and Through Dept. of Family Services v. Jennings*, 818 P.2d 1149, 1150 (Wyo. 1991). *See also KAC v. SR*, 771 P.2d 811, 813 (Wyo.1989); *State v. Stovall*, 648 P.2d 543, 547–48 (Wyo.1982); *Mahaney v. Hunter Enterprises, Inc.*, 426 P.2d 442, 444 (Wyo. 1967). Thus, statutes are not to be understood as effecting any change in the common law beyond that which is clearly indicated either by express terms or by necessary implication from the language used. Because § 30–5–303(b) is a fee-shifting statute, it must be narrowly construed.

[¶ 57] The statute provides for the award of reasonable attorney's fees to a prevailing party in any proceeding brought under the WRPA. The United States Supreme Court discussed the definition of "prevailing party" at length in *Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). In discussing statutory language, the Court said:

> In designating those parties eligible for an award of litigation costs, Congress employed the term "prevailing party," a legal term of art. Black's Law Dictionary 1145 (7th ed.1999) defines "prevailing party" as "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded in certain cases, the court will award attorney's fees to the prevailing party.—Also termed *successful party*."

532 U.S. at 603, 121 S.Ct. at 1839. In a specially concurring opinion, Justice Scalia, joined by Justice Thomas, offered a thorough discussion as to the definition of the term "prevailing party:"

> [W]hen "prevailing party" is used by courts or legislatures in the context of a lawsuit, it is a term of art. It has traditionally—and to my knowledge, prior to enactment of the first of the statutes at issue here, *invariably*—meant the party that wins the suit or obtains a finding (or an admission) of liability. Not the party that ultimately gets his way because his adversary dies before the suit comes to judgment; not the party that gets his way because circumstances so change that a

victory on the legal point for the other side turns out to be a practical victory for him; and not the party that gets his way because the other side ceases (for whatever reason) its offensive conduct. If a nuisance suit is mooted because the defendant asphalt plant has gone bankrupt and ceased operations, one would not normally call the plaintiff the prevailing party. And it would make no difference, as far as the propriety of that characterization is concerned, if the plant did not go bankrupt but moved to a new location to avoid the expense of litigation. In one sense the plaintiff would have "prevailed"; but he would not be the prevailing party in the lawsuit. Words that have acquired a specialized meaning in the legal context must be accorded their *legal* meaning.

*Id.* at 616, 121 S.Ct. at 1846 (Scalia, J., concurring).

[¶ 58] Given the definition of "prevailing party," the *Buckhannon* Court held that, in order to be deemed a prevailing party, there must be a material modification in the **legal** relationship of the parties. *Id.* at 604, 121 S.Ct. at 1840. The *Buckhannon* Court rejected the catalyst theory because it "allows an award where there is no judicially sanctioned change in the legal relationship of the parties." *Id.* at 605, 121 S.Ct. at 1840. Accordingly, the Court determined a defendant's voluntary change in conduct, absent judicial imprimatur, is insufficient to support an award of attorney's fees under a "prevailing party" statute. *Id.*

[¶ 59] I find the United States Supreme Court's argument rejecting the catalyst theory sound for the narrow construction we must give § 30–5–303(b). I do not believe the Wyoming Legislature intended, by the statutory language used, to abrogate the common law to the extent that reasonable attorney's fees should be awarded if some important outcome favorable to the plaintiff is reached during the period of time a legal action is pending, even though the plaintiff did not, in any judicial sense, prevail. I would hold that, based on the plain language of § 30–5–303(b), a party can only be consid-

ered a "prevailing party" in a juridical action if the party receives some form of juridical relief.[4]

[¶ 60] Returning, then, to the underlying action, this Court should reverse the district court's award of limited attorney's fees to Morris. The underlying action was comprised of two distinct claims: one for unpaid royalties pursuant to § 30–5–303(a); and one for failure to provide appropriate reports pursuant to § 30–5–305(b). As for unpaid royalties, the district court determined that, under the evidence presented, CMS paid Morris the royalties she was due. CMS, therefore, received the ultimate favorable judgment. The majority opinion has upheld, and rightly so, the district court's ultimate ruling in favor of CMS on the unpaid royalty claim. Certainly some payments to Morris by CMS occurred during the pendency of the legal proceedings, but the payments occurred outside the proceedings, involving no judicial action. For purposes of attorney's fees then, CMS was the prevailing party with regard to the claim for unpaid royalties. Since I would also hold that Morris failed to prove lack of reporting, CMS would also be the prevailing party on that issue.

[¶ 61] There is another important consideration supporting the rejection of the catalyst theory. Practically, adoption of the catalyst theory results in the necessity for extensive collateral litigation. Returning to *Buckhannon*, the United States Supreme Court expressed its concern that the catalyst theory "is clearly not a formula for 'ready administrability,'" 532 U.S. at 610, 121 S.Ct. at 1843 (quoting *Burlington v. Dague*, 505 U.S. 557, 566, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)), as a "catalyst theory hearing would require analysis ... that will likely depend on a highly factbound inquiry and may turn on reasonable inferences from the nature and timing of the defendant's change in conduct." 532 U.S. at 609, 121 S.Ct. at 1843 (internal quotation marks omitted).

[¶ 62] The instant case provides a good example of the necessity for secondary litiga-

---

4. Juridical relief would include not only judgment on the merits, but also such things as a court ordered consent decree or a court-approved settlement agreement.

tion under the catalyst theory. The question for determination as to whether Morris was a prevailing party under the catalyst theory is CMS's motivation for payment. The district court provided no specific factual findings supporting its determination that CMS would not have paid Morris if she had not filed the instant legal action. My review of the record evidence reveals this determination to be clearly erroneous. CMS worked extensively with Morris from the beginning of their dispute to help her resolve her title problems so it could pay her the legally appropriate amount. When she resolved the initial problems, CMS paid her royalties due. New title problems arose, prompting CMS to once again suspend payment. Once again CMS worked extensively, including involving its own attorney, to assist Morris in resolving the new title problems. A few days before Morris filed the instant legal action, CMS established an escrow account, funding it shortly after the action was filed. CMS continued to work with Morris to resolve her title problems. Title in Morris eventually was cleared to CMS's satisfaction, at which time CMS paid Morris the escrowed funds, as her interest appeared.

[¶ 63] I find no evidence that CMS, at any time, withheld payment of royalties to Morris for any reason other than title problems. The obvious corollary is that the institution of the instant legal action in no way prompted CMS to make payment. Rather, payment was made because title was cleared. The only apparent change in CMS's actions possibly motivated by the institution of the instant legal action is its transferring withheld payments from a suspension account to an escrow account. This action does not reflect on its willingness to pay royalties due.

While I would thus dissent from the majority opinion's conclusion that the ruling of the district court on the matter is correct, I have a larger point to make. Engaging in the above type of factual analysis into the motivation of a party can only decrease the efficiency of our courts.

[¶ 64] I would follow the lead of the United States Supreme Court and adopt a bright-line rule defining a person who improves her position through litigation as a person who receives relief sought by means of some form of juridical action. Only juridical action can change the legal relationship between parties, the proper function of any legal action.

[¶ 65] I understand the frustration caused by the avoidance by CMS of any damages and penalties in a civil action under the WRPA despite its infractions of WRPA provisions. The WRPA, however, does not create strict liability. Proof of damages resulting from violations is required. Morris failed in her burden of proof. If she had proven the amount of payments owed from production in specific months, she would have been entitled to the money plus 18% interest from the time owed. If she had proven payments unaccompanied by a report containing the statutory requisite information, she would have been entitled to a $100 penalty.[5] It is her failure to provide such proof that has brought about the result I believe is required.

---

**5.** I agree with the majority opinion's method of calculation of the imposition of the $100 penalty.