2011 WY 41

**Virginia L. WALTERS, Appellant (Plaintiff),**

v.

**Lonnie WALTERS, Appellee (Defendant).**

Nos. S–09–0152, S–10–0059.

Supreme Court of Wyoming.

March 9, 2011.

Representing Appellant: Kristin Shaun Wilkerson of Trent & Wilkerson Law Office, LLC, Laramie, Wyoming.

Representing Appellee: Mary T. Parsons of Parsons & Cameron, P.C., Cheyenne, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1]   The two appeals consolidated for decision in this opinion arise out of the divorce litigation between Virginia L. Walters (Mrs. Walters) and Lonnie Walters (Mr. Walters). In appeal No. S–09–0152, Mrs. Walters challenges the district court's property distribution set forth in the Judgment and Decree of Divorce filed on June 3, 2009. We affirm that judgment. In appeal No. S–10–0059, Mrs. Walters appeals from the district court's order filed on January 15, 2010, in the post-divorce proceeding that found her in civil contempt and imposed sanctions. We reverse that order.

## APPEAL NO. S–09–0152

### ISSUES

[¶ 2]   Mrs. Walters presents this statement of the issues:

I.   Did the district court abuse its discretion, commit serious procedural error and/or violate a principle of law by finding Ms. Walters in contempt?

II.   Did the district court abuse its discretion by punishing Ms. Walters through its distribution of property?

III.   Was the district court's division of marital property clearly erroneous, against the great weight of evidence, and/or otherwise not supported by substantial evidence?

Mr. Walters presents the issues in this way:

I.   Whether the district court abused its discretion, committed a procedural error, or violated a principal of law by finding the appellant in contempt of court

II.   Whether the district court's division of marital property was clearly erroneous, against the great weight of the evidence or otherwise not supported by substantial evidence

In her reply brief, Mrs. Walters responds with this issue statement:

Even if Appellant were properly found in civil contempt, the district court abused its discretion, committed a procedural error or violated a principal of law by not imposing a fine based on Appellee's actual loss.

### FACTS AND PROCEEDINGS

[¶ 3]   The parties married on May 5, 2006; Mrs. Walters filed her complaint for divorce on August 6, 2008; and Mr. Walters filed his answer and counterclaim on August 14, 2008. No children were born to the parties. The parties pursued discovery. The district court issued mutual restraining orders that prohibited the parties from expending marital assets, other than for daily living expenses, until further order of the court. The district court issued orders to show cause to both parties concerning alleged violations of those orders but opted to determine those alleged violations at the trial.

[¶ 4]   The trial consumed three full days and an hour of a fourth day, from March 24 to April 1, 2009. The primary contested issue at trial was the distribution of the marital property, although the district court also determined whether Mrs. Walters had violated a mutual restraining order as mentioned above. The district court heard testimony from twelve witnesses and considered a substantial number of exhibits, including financial records and a real estate appraisal of the parties' Cheyenne property on Cox Road. The parties' respective counsel agreed that the district court's determination of the marital property distribution would turn on the credibility of the parties. As succinctly stated by Mrs. Walters' counsel in his closing argument, "this boils down to credibility. You're the trier of fact. You're the one who looks at the people in the eyes and sees their mannerisms, their rationale of the state-

ments. And what makes up the credibility of a witness is an influx of information."

[¶ 5] The trial concluded on April 1, 2009; the district court issued its decision letter on April 15, 2009; and the district court filed the Judgment and Decree of Divorce, which incorporated by reference its decision letter, on June 3, 2009. In the decision letter, the district court explained its determination of the marital property distribution and its determination of Mrs. Walters' alleged violation of a mutual restraining order:

The determination of an equitable distribution of property is a more involved question. [Mr. Walters] operated Lonnie's Roustabout Service, LLC (LRS) in Kansas for over twenty years. The roustabout service was a Kansas limited liability company with [Mr. Walters] as the sole and controlling member. [Mrs. Walters] is also originally from Kansas, although she lived in Cheyenne at the time the parties developed what might loosely be described as a romantic relationship. Her testimony as to her earnings and occupation at the time of the marriage began was nebulous, and the Court gleaned from it only that she was trained as a paramedic and provided some form of home health care to an elderly woman living in Cheyenne.

The marriage occurred in 2006 after [Mr. Walters] asked [Mrs. Walters], whom he barely knew, to go to Hawaii with him for a vacation in January of that year. During the vacation he proposed, and she accepted. The marriage followed in May.

The story of the engagement and marriage grew more improbable as it developed. [Mr. Walters] had been quite successful in his business, and had acquired cash, real estate, and other assets. [Mrs. Walters] had around $100,000 in liquid assets, a 2004 Ford pickup, and lived in a rented mobile home. At some point before or after the marriage, depending upon whom one believes, [Mrs. Walters] became involved in [Mr. Walter's] business.

The business accounting of LRS did not adhere to standard practices. Rather than reimbursing himself for business expenses based on credit card receipts or cash payments, Mr. Walters would receive checks from the business which were deposited in a personal account or converted to cash. He does claim that he had receipts for appropriate expenses and provided them to his accountant, who would not expense any item not supported by a receipt for tax purposes. This was no doubt acceptable in a single-member LLC, since no owner was harmed, but it created a climate in which it became very difficult for the Court to analyze the transactions for purposes of the property division in this divorce action. For example, at one point Mr. Walters testified that he had written a check on the business account to Mrs. Walters before the marriage for around $3,000. The memo on the check was for mowing and painting. The logical conclusion one would draw is that LRS paid Virginia Walters for mowing and painting. However, Mr. Walters testified that he actually did the mowing and painting himself, and gave her the money to buy a wedding dress. This sort of improbable testimony about the accounting processes of LRS emanated from both parties and abounded throughout the trial.

The Court cannot shake the notion that each party may have invented a story, at least in part, to justify his or her claims with regard to the property settlement. We shall begin with Mrs. Walters. Funds in the amount of $50,000 were transferred from an account controlled by Lonnie Walters to Lonnie Walters by wire transfer, and the day after, were used by Mr. Walters to purchase a lot in Cheyenne on which a metal building was constructed and then razed, and on which a house was also constructed, as more fully discussed below. Mr. Walters' claims' concerning these funds are credible—he contends that he provided the funds for the purchase of a lot that he and Mrs. Walters had looked at and agreed upon for purposes of building a marital home, and that at closing, while he was in Kansas, she simply omitted him from the title intentionally.

Mrs. Walters claims, on the other hand, that before the marriage Mr. Walters asked her to help get his roustabout service in shape to sell (including cleaning up the books), and promised to pay her

$50,000 to do so, regardless of whether the business sold or not. Mrs. Walters has no experience to speak of in accounting and none in the roustabout business. There is nothing to corroborate this claim, and the Court rejects it.

The testimony indicated that Mrs. Walters eventually took control of the roustabout service books. She paid herself about $80,000 in expense reimbursement, which she placed in accounts to which only she and her children had access. She now claims that Mr. Walters promised to pay her between $80,000 and $100,000 per year for her services for the business (in which she performed some painting, mowing and minor bookkeeping services). She testified that these amounts were to be in addition to her wages, which amounted to about $25.00 per hour, in addition to $10 per hour for her teenage son, who was not even in Kansas, the only place he could have been working for LRS, at certain times that he was receiving paychecks. Remarkably, the amounts of the expense checks adds up to approximately the $80,000 to $100,000 per year she claims to have been promised. She and her accountant characterized these as draws against the business.

Virginia Walters never owned any interest in the roustabout service, and no check to her is characterized as a dividend or draw. She wrote these checks to herself after persuading Mr. Walters to let her sign checks on the business account. No logical reason for such compensation is evident based on the services she rendered or the prosperity of the business, and there is likewise no evidence which would indicate that Mr. Walters knew of the scope of these withdrawals. Testimony indicated that Mrs. Walters kept the checkbook and business records under lock and key. The Court arrives at the inevitable conclusion that Mrs. Walters simply looted the business and segregated those funds in anticipation of this divorce.

In addition, the record is clear that Mrs. Walters violated a court order in this case. The Court entered a mutual restraining order which would have prevented either party from expending substantial funds of the marital estate without a further order of the Court. Despite this order, Mrs. Walters used funds to build a home on the land described above after it was entered. She attempted to justify this action by claiming that the home had to be finished in order to protect the structure already in place from deterioration. Photographic evidence proved that the home had only a foundation, or at most a foundation and subfloor, at the time the order was entered, and that it was unnecessary to finish the structure to protect an investment in framing, etc. No explanation whatsoever was given for the purchase of furnishings and installation of fixtures in the structure. Mrs. Walters never asked the Court to authorize the expenditures. It has therefore been proven by clear and convincing evidence that Mrs. Walters willfully violated a court order and is in contempt of court. The Court will take this contempt into account in formulating its decree in this matter, and will reserve sanctions which may be imposed in the event of failure to comply with any of its conditions.

The record is also clear that Mrs. Walters hid assets and destroyed business records to prevent an accurate accounting of funds which she has taken. During the litigation, she closed accounts and a safe-deposit box in which property was to have been kept in an effort to make determination of the assets in her possession a moving target. When the Court issued an order authorizing a gun safe on her property to be opened on short notice, she was found to be in possession of articles of property which she had denied having. It is well-settled that a party's bad-faith withholding, destruction, or alteration of a document or other physical evidence relevant to proof of an issue at trial gives rise to a presumption or inference that the evidence would have been unfavorable to the party responsible for its nonproduction, destruction, or alteration. *Abraham v. Great Western Energy, LLC,* 2004 WY 145, ¶ 20, 101 P.3d 446, 455–456 (Wyo.2004).

For his part, Lonnie Walters claimed that Mrs. Walters took approximately $200,000 from a safe-deposit box located at a local bank. He explained in testimony

that over the past 20 years, in good years, he would put $10,000 in an envelope and hide the envelopes in a wall safe at his home in Kansas. He claims that he brought 19 of these envelopes which had accumulated to Wyoming and put them in the safe deposit box, added another approximately thirteen thousand dollars, and then gave Mrs. Walters both keys to the box, effectively locking himself out, because he feared that he might lose the key.

Mr. Walters was unable to provide any corroboration of his claims concerning the $200,000. No witness was called to substantiate its existence, and communications between counsel and discovery in this case did not suggest that such a sum ever existed until the eve of trial. While it is not impossible that Mr. Walters could have owned cash in that amount, its existence was not proven, and the Court will not consider that amount in the property division. Nagging doubts do remain, given Mrs. Walters' other misconduct, that she may in fact have gotten away with that sum of money, but doubts do not amount to proof.

Finally, the Court must recognize that Virginia Walters is entitled to equitable portion of the marital earnings for the mercifully brief duration of this marriage. However, as the Supreme Court has observed, an equitable distribution is not necessarily equal, and an equitable distribution is in fact likely to be unequal. *Moss v. Moss*, 2007 WY 67, ¶ 4, 156 P.3d 316, 318 (Wyo.2007). That will certainly be true in this case, in which Mr. Walters had far more assets at the beginning of this brief marriage than Mrs. Walters, and in which the excellent earnings which LRS enjoyed were the fruit of his sustained effort over many years. The Court rejects the notion that Virginia Walters' efforts contributed substantially to these financial rewards. On the other hand, both parties each bear some responsibility for the murky environment in which the Court must construct a property division.

The division of property will be as follows:

**7902 Cox Road.** This property actually includes three components—the land, the funds from a steel building that was taken down, and the house itself. The Court is convinced that Mr. Walters paid for the land from funds which he had accumulated, and is entitled to a credit for that expenditure. It is also clear that LRS paid for a metal building which was erected in the wrong location and which was later taken down. Wyoming Steel, the company which built the building and then removed it, paid $37,500 (less some damage to the steel) in settlement of claims against it for the allegedly faulty construction. Lonnie Walters will receive these funds, less any deductions made by Wyoming Steel to the building. In addition, Mr. Walters produced proof of payment for pouring of a concrete basement and foundation, and he is entitled to reimbursement for these funds.

Mrs. Walters was in possession of certain assets which she claims were used to purchase materials which went into the construction of the house itself, the foundation excluded, and she acted as the general contractor. While these funds were in part the result of deplorable efforts to conceal assets and to steal a march on Mr. Walters in direct violation of a court order, the Court reluctantly concludes that she is entitled to some of its value. It appears that the home was poorly designed and constructed, but it is valued by appraisal at $304,000. The division of the home will therefore be as follows:

a. Mrs. Walters will be entitled to possession of the home and contents except as specifically provided herein.

b. Mr. Walters will be entitled to reimbursement of the following:

$50,000 purchase price of the land.

The amount paid by Wyoming Steel for the building.

The cost of erecting the foundation and basement.

c. Mrs. Walters will reimburse Mr. Walters for the above amounts within 180 days of entry of a decree of divorce. Mr. Walters will be entitled to a judicial

lien or mortgage on the property until this debt is satisfied.

d. If Mr. Walters is not paid the above amounts within 180 days of entry of the decree, the property will be sold and the above amounts payable to Lonnie Walters satisfied therefrom, with the balance of the funds remaining to be paid to Mrs. Walters.

**2006 Ford F–150s.** Each party shall receive the 2006 Ford F–150 in his or her possession at this time. Mr. Walters claims that Mrs. Walters' vehicle is actually an asset of the roustabout business, but it is more likely that the funds to purchase it were a gift. A transfer of property between husband and wife or parent and child is presumed to be a gift. *Kelsey v. Anderson,* 421 P.2d 163, 164 (Wyo.1966); 38 Am.Jur. *Gifts* § 92 at page 892 (1968); 38A CJS *Gifts* § 67 at pages 250–251 (1966). The same rule has been applied in Wyoming to real property when the spouse who pays for the property deeds an interest to the other spouse. *See Wallop v. Wallop,* 2004 WY 46, ¶ 27, 88 P.2d [P.3d] 1022, 1030 (Wyo.2004); *Barton v. Barton,* 996 P.2d 1, 4 (Wyo.2000); and *Tyler v. Tyler,* 624 P.2d 784, 785–786 (Wyo.1981).

The evidence presented does not rebut and indeed seems to support the notion that the 2006 Ford F–150 was a gift from Mr. Walters through LRS to Mrs. Walters. He may regret his generosity at this point, but the bell cannot be unrung.

**2008 Ford F–150.** This vehicle is titled in the names of Mrs. Walters and her son, and the son claims that it is his pickup truck. It was paid for from an account in Mrs. Walters and her son's name, and which contained funds which [Mrs. Walters] claims were her son's wages. The record supports Mrs. Walters' position on this issue. The truck will be deemed to be owned by Mrs. Walters' son Bryan Akers, and the decree shall so state.

**"Pershing" Account.** Banc West Account . . . contained approximately $850,000 at the time of trial. The evidence established that these funds were premarital funds of Mr. Walters, funds from the sale of some real property owned by Mr.

Walters, some earnings of Lonnie's Roustabout Service during the marriage, and some funds of which Mr. Walters was the trustee. This account shall be awarded solely to Lonnie Walters.

**Banc West Account** . . . . This account was funded by Mrs. Walters, who claims that she used the funds to build the home described above. To the extent that any funds remain in said account, they will be awarded to Virginia Walters.

**Kansas Home.** Mr. Walters owned a home in Ulysses, Kansas before the marriage. It will be awarded to him.

**Lonnie's Roustabout Service Business and Equipment.** Lonnie Walters shall be awarded all equipment listed on the depreciation schedule of LRS unless otherwise specified in this decision letter, including but not limited to the two tractors and mowing attachments and any trailers (including the PJ trailer), regardless of who possesses them at this time. Mr. Walters shall also be awarded his interest in LRS free of any claim by Mrs. Walters.

**Lonnie's Soda Blasting Equipment.** To the extent that any equipment carried on the books of Lonnie's Soda Blasting exists, it is awarded to Lonnie Walters along with ownership of the LLC.

**Contents of Safe.** As noted above, the Court authorized the examination of a gun safe located at the Cox road property on short notice. The contents were photographed, and the photographs were made part of the court record. Lonnie Walters shall be entitled to all coins contained in the safe, as well as any personal documents (including his passport, birth certificates pertaining to members of the Walters family, cancelled driver's license and any other personal documents). Virginia Walters will be entitled to the firearms in the safe and anything not listed above.

**Outdoors Etc., LLC.** The parties had an L.L.C. which produced certain craft-like items for sale. It does not appear that the business was particularly active or successful, but special equipment was purchased, including sewing machines, etc. These will be awarded to Virginia Walters, along with the ownership of the L.L.C.

**Attorney Fees.** Both parties claim substantial attorney fees and expenses. Both parties have been left with substantial property, and the Court declines to award attorney fees to either. The proven misconduct of Virginia Walters has been taken into account in the property division, and no award of attorney fees in favor of Lonnie Walters will therefore be made in consideration of the position in which the parties are left by this decision.

**Miscellaneous.**

1.  The parties shall promptly notify the Court of any significant marital debt or asset not disposed of by this decision letter so that the property division contained herein may be supplemented to address those items of property.

2.  The decree shall contain provisions requiring the parties to promptly execute all documents necessary to effectuate the property division contained therein.

3.  The Court has purposely not concluded that each party should be entitled to ownership of any asset in his or her possession which has not been dealt with in this decision letter. If it is determined at any later time that substantial marital assets have been concealed or not disclosed by design, the discovery of those assets may justify reopening of this decree under Wyoming Rule of Civil Procedure 60(b).

4.  [Mr. Walters' counsel] will prepare the decree implementing these decisions unless the parties otherwise agree.

5.  The record in this case reveals misconduct which is prejudicial to the administration of justice. A failure on the part of either party to comply with the terms of the decree when entered may be punished as a civil contempt to compel compliance, and sanctions may include incarceration pending compliance.

## STANDARD OF REVIEW

[¶ 6] The Wyoming Legislature has given our courts direction in determining the equitable disposition of the parties' marital property:

> In granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children. The court may decree to either party reasonable alimony out of the estate of the other having regard for the other's ability to pay and may order so much of the other's real estate or the rents and profits thereof as is necessary be assigned and set out to either party for life, or may decree a specific sum be paid by either party.

Wyo. Stat. Ann. § 20–2–114 (LexisNexis 2009). Our jurisprudence provides us with a legion of applicable precedents. In *Sweat v. Sweat*, 2003 WY 82, ¶ 6, 72 P.3d 276, 278 (Wyo.2003), we explained:

> The division of marital property is within the trial court's sound discretion, and we will not disturb that division absent an abuse of discretion. *Carlton v. Carlton*, 997 P.2d 1028, 1032 (Wyo.2000). A just and equitable distribution is as likely as not to be unequal. *Id.* We evaluate whether the trial court's property division is, in fact, equitable from the perspective of the overall distribution of marital assets and liabilities rather than from a narrow focus on the effects of any particular disposition. *Id.* From that perspective, we afford the trial court considerable discretion to form a distributive scheme appropriate to the peculiar circumstances of each individual case, and we will not disturb such a scheme absent a showing that the trial court clearly abused its discretion. *Id.* The division of property in a divorce case should not be disturbed except on clear grounds as the trial court is usually in a better position than the appellate court to judge the parties' respective merits and needs. *Metz v. Metz*, 2003 WY 3, ¶ 6, 61 P.3d 383, ¶ 6 (Wyo.2003). The trial court is also in the best position to assess the witnesses' credibility and weigh their testi-

mony. *Raymond v. Raymond,* 956 P.2d 329, 332 (Wyo.1998). We, therefore, give considerable deference to its findings. *Id.* The ultimate question in determining whether an abuse of discretion occurred is whether the trial court could reasonably conclude as it did. *Metz,* 2003 WY 3, ¶ 6. In answering that question, we consider only the evidence of the successful party, ignore the evidence of the unsuccessful party, and grant the successful party every favorable inference that can be drawn from the record. *Holland v. Holland,* 2001 WY 113, ¶ 8, 35 P.3d 409, ¶ 8 (Wyo.2001).

## DISCUSSION

[¶ 7]   Mrs. Walters acknowledges that on appellate review this Court evaluates whether the district court's property division is equitable from the perspective of the overall distribution rather than from a narrow focus on the effects of any particular disposition. She also states that no single distribution made by the district court standing alone shocks the conscience in this case. Despite her acknowledgment and statement, however, she argues that the district court's treatment of the parties' coins, marital income in the Pershing account during the brief duration of the marriage, 4.23 acre parcel on which the parties' house was built, and the parties' house was "shockingly inequitable and unjust." We reject her arguments.

[¶ 8]   With respect to the coins, our careful review of the record shows that both parties presented evidence about their origin and value.   The district court determined that Mr. Walters' testimony that they were his and were worth approximately $7,050 was credible.   Because we consider only Mr. Walters' evidence and give it every favorable inference, afford the district court considerable discretion, and do not focus narrowly on any particular disposition, we reject Mrs. Walters' argument about the coins.

[¶ 9]   With respect to the marital income in the Pershing account, Mrs. Walters notes that she was awarded nothing from this account, even though a considerable sum of money was generated through Mr. Walters' sole proprietorship of LRS during their two-year marriage.   Once again, our careful review of the record shows that the district court properly considered the parties' evidence concerning the Pershing account, the source of the funds in that account, and the brief duration of the marriage in arriving at its decision to award that account to Mr. Walters.   Applying the requirements of our standard of review, we reject Mrs. Walters' argument concerning this account.

[¶ 10]   With respect to the parties' 4.23 acre parcel on which the parties' house was built, Mrs. Walters claims that the district court erred by requiring her to reimburse Mr. Walters the sum of $50,000 which he transferred to her for closing on the purchase of that parcel in June 2006.   She argues that because she paid the seller from her separate account, the sales contract drafted by the seller lists her as the sole buyer, and the deed lists only her name as buyer, then the rebuttable presumption arose that the $50,000 sum was a gift from Mr. Walters. *Barton v. Barton,* 996 P.2d 1, 4 (Wyo.2000).   She asserts that the record is silent as to whether Mr. Walters rebutted that presumption.   Mr. Walters contends that his evidence did rebut the presumption. We agree.   Our careful review of the record shows that Mr. Walters was with Mrs. Walters when they called the seller about the parcel, both met with the seller to discuss the purchase, Mr. Walters made the offer to the seller and wrote the earnest money check, and Mr. Walters clearly expected his name to be on the deed as he expected to build a home to live in with his wife.   In its Decision Letter, the district court addressed this matter:

> Mr. Walters' claims' concerning these funds are credible—he contends that he provided the funds for the purchase of a lot that he and Mrs. Walters had looked at and agreed upon for purposes of building a marital home, and that at closing, while he was in Kansas, she simply omitted him from the title intentionally.

It is clear to us that the district court found that Mr. Walters rebutted the gift presumption.   We agree.

[¶ 11] Finally, with respect to the parties' house built on the 4.23 acre parcel which the district court awarded her, Mrs. Walters contends that the appraised value of $304,000 is "arguably inflated" and, since the true value of the house is less than that appraisal, she received less in the property division. Our careful review of the record shows that Mr. Walters presented the testimony and report of a certified residential real estate appraiser. The district court received the report into evidence by stipulation of counsel. The appraiser was examined by both counsel and the court. In the opening statement of Mrs. Walters' counsel, he stated that while Mrs. Walters did not agree with the exact amount of the appraisal, "it is generally in that ballpark" and she would stipulate to a value of $260,000. Once again, applying our standard of review, we find no merit in Mrs. Walters' argument on this point. Considering the relevant evidence presented by Mr. Walters and giving it every favorable and reasonable inference, while ignoring Mrs. Walters' evidence, we are satisfied that the district court could reasonably conclude as it did.

[¶ 12] One final matter remains for our consideration concerning the divorce proceedings. In July 2008, a month before Mrs. Walters filed for divorce, she began construction of the house on the 4.23 acre parcel mentioned above. Once the divorce litigation was underway, the district court issued a mutual restraining order prohibiting the parties from expending marital assets, other than for daily living expenses, until further order of the court. Despite this order, Mrs. Walters continued construction on the house. The district court considered this alleged violation of its restraining order during the trial. The district court addressed the matter in its Decision Letter:

> In addition, the record is clear that Mrs. Walters violated a court order in this case. The Court entered a mutual restraining order which would have prevented either party from expending substantial funds of the marital estate without a further order of the Court. Despite this order, Mrs. Walters used funds to build a home on the land described above after it was entered.

> She attempted to justify this action by claiming that the home had to be finished in order to protect the structure already in place from deterioration. Photographic evidence proved that the home had only a foundation, or at most a foundation and subfloor, at the time the order was entered, and that it was unnecessary to finish the structure to protect an investment in framing, etc. No explanation whatsoever was given for the purchase of furnishings and installation of fixtures in the structure. Mrs. Walters never asked the Court to authorize the expenditures. It has therefore been proven by clear and convincing evidence that Mrs. Walters willfully violated a court order and is in contempt of court. The Court will take this contempt into account in formulating its decree in this matter, and will reserve sanctions which may be imposed in the event of failure to comply with any of its conditions.

The district court included similar language in its Judgment and Decree of Divorce. In their appellate briefing, the parties provide considerable discussion to whether the district court found Mrs. Walters in civil or criminal contempt. We conclude that it is unnecessary to determine that issue because, as both parties acknowledge, the district court did not explicitly impose a punishment or sanction on Mrs. Walters, but rather explicitly reserved sanctions "which may be imposed in the event of failure to comply with any of [the divorce decree's] conditions." We reject Mrs. Walters' assertion that the district court "appears to have punished [her] contemptuous conduct by awarding certain undisclosed property to [Mr. Walters] in the division of marital property, which is arguably an abuse of discretion." As Mr. Walters points out, Mrs. Walters is unable to indicate what property was awarded to him as punishment. We afford the district court considerable discretion to form a distributive scheme appropriate to the peculiar circumstances of the individual case including the respective merits and credibility of the parties. We have carefully evaluated the district court's property division and find it is equitable from the perspective of the overall distribution of marital assets and liabilities.

We find no reason to disturb that thoughtful division.

[¶ 13] We affirm the Judgment and Decree of Divorce filed on June 3, 2009.

## APPEAL NO. S–10–0059

### ISSUES

[¶ 14] In Mrs. Walters' appeal of the district court's post-divorce proceeding order filed on January 15, 2010, finding her in civil contempt of court and awarding to Mr. Walters compensatory damages of $10,000, we shall state the issues as follows:

1. Whether Mr. Walters proved that Mrs. Walters violated court orders issued in the divorce proceedings.

2. Whether the district court abused its discretion, committed procedural error, or violated a principle of law by finding Mrs. Walters in civil contempt of court and awarding compensatory damages of $10,000.00.

### FACTS AND PROCEEDINGS

[¶ 15] On June 19, 2009, sixteen days after the district court had filed its Judgment and Decree of Divorce, Mr. Walters filed three separate motions for orders to show cause why Mrs. Walters should not be held in contempt of court for several alleged violations of the Judgment and Decree of Divorce. The alleged violations that are pertinent to this appeal concerned Mrs. Walters' transferring ownership of the PJ trailer, awarded to Mr. Walters in the divorce, to a third party five days after the district court's decision letter was issued; failing to return to Mr. Walters coins awarded him in the divorce; and failing to return to Mr. Walters certain personal documents as ordered by the district court. On June 22, 2009, the district court issued its show cause order; after several continuances, the district court heard the matter on October 2 and October 27, 2009.

[¶ 16] On October 27, at the close of the hearing, the district court stated that it found Mrs. Walters had committed the violations alleged and was, therefore, in contempt of court. The district court then stated:

And I do note that the sanction I'm about to impose is not calculated with great precision because the very nature of acts which I believe to have been contemptuous are such as to make it impossible to calculate something resembling damages. **But I believe there has to be a punitive element in this matter.** And so I'm going to order this by way of contempt sanctions. I'm going to order that as—I will order effective November 16, 2009, a judgment in favor of Mr. Walters against [Mrs. Walters] for the sum of $10,000 reflecting the contempt, sanctions for the contempt which I have previously indicated.

In addition, I will also award defendant a portion of the attorney fees associated with these contempt proceedings, since I didn't award anything related to the trailer and tractor, and I decline to hear the issues with regard to the bookkeeping. I think that the portion of attorney fees has to be associated solely with the contempt that I did find in this matter, and I will award those fees.

I will give [Mrs. Walters] this much of an out. If you happen to find any of the missing property and deliver it to counsel for the defendant before November 16, 2009, I would consider a request to abate that judgment in the amount—to the extent of the amount of some of that property, although I believe some portion of those sanctions would have to remain regardless, given the continuing disregard of this Court's orders.

(Emphasis added.)

[¶ 17] On January 14, 2010, the parties met again with the district court to discuss the district court's concern about language in paragraph 10 of the proposed order approved by both counsel. Here is the discussion that followed:

THE COURT: Please be seated. Court is in session. We're here today in *Walters v. Walters*, 172–327, which is a divorce case which has had some post-divorce contempt proceedings. And I specifically recall—I just wanted to make a record on the order that I have received which was approved by both counsel. I'm not sure when I received that. I know that I kind of envi-

sioned that we could have a 15–minute phone conversation or something about this order. And I think that maybe that was set, and it had to be continued because of availability of counsel.

And ultimately we ended up here today. I don't know—here is my concern about the order. I'm looking at Paragraph 10 of the order, and it says—and I'll quote— "There has to be a punitive element in this matter. And as sanctions against the plaintiff, she is ordered to pay the defendant the sum of $10,000 for the contempt set forth herein."

My reading of that if I were an appellate judge would be probably like that's a fine or something which would be in the nature of a criminal contempt. Now, I may have used the term punitive in the ruling I made. I don't know if I did or not. But the intent was actually to provide some compensation to Mr. Walters for some of the losses that he would have sustained as a result of not getting his property back. Those are very difficult—I think I noted on the record—to determine because the articles aren't here to value, so it is difficult to arrive at a number.

I also there [sic] was some element to that that related to the fact that Mrs. Walters went ahead and built this house. She put a bunch of money into materials. And I think the evidence indicated it was pretty shoddy construction. And I originally withheld contempt sanctions for that, hoping that the rest of the property would be transferred; but that didn't happen as I feel that I ordered.

And so part of this was the defendant probably suffered some damages as a result of that, which is once again very difficult to determine. Last, of course, there is an element to putting pressure on a party to pay and do the things that they are ordered to do, which is why I made the award.

So I'm not dissatisfied with the language in Paragraph 10, but I did want to give counsel the opportunity to redraft it and also to give you the opportunity to argue that it is in essence a criminal type contempt, or would you agree that it is a civil contempt and ask you if you had any procedural issues with the way the process went. Because obviously if it was a criminal contempt, it would have had a whole different set of procedures which, you know, I never made any effort to follow. And I don't think the parties ever supplied any type of documents that would have allowed me to do that. So maybe if I could just hear from counsel for the plaintiff first, ...

[Mrs. Walters' Counsel]: Thank you, Your Honor. I would agree that I think there is a punitive element. The language in the order does imply that it is some type of a criminal contempt in that matter. And while that was the language from the hearing—I believe we have copies of the transcript—and that was the language—I understand now, if my understanding is correct, it was your intent to provide compensation to the defendant for the losses that he had suffered based on some of these—the coins and the documents, correct?

THE COURT: And also I think that I kind of withheld the sanctions relating to the house construction. He probably lost something in that process, too. So that was at least a substantial part of it in my eyes. I think maybe I noted on the record at the time that it was very difficult for me to come up with a specific number of damages.

[Mrs. Walters' Counsel]: And that was my question, Your Honor, with regards to the damage amount and specifically how you had calculated the $10,000 figure, where that figure came from specifically; if we are talking about a civil, you know, a civil fine payable to the private party as a form of compensation, where that figure came from. That's more of a personal question of mine, just curiosity I guess, in how that was arrived from.

THE COURT: There really wasn't any formula, I can tell you that. It was more kind of taking the magnitude of the case; the expense the parties were put to; the delay; the potential value, measurable or unmeasurable, of the property involved. Like, for example, some of the things that

are just pieces of paper with sentimental value and how to value them, but yet there needed to be something by way of a sanction for not providing those. So it's a very imprecise process I would certainly grant you.

[Mrs. Walters' Counsel]: I understand that. And I would have one comment with regards to that, Your Honor. And that would be it is my understanding—and I could be incorrect on this—but it is my understanding that under the law that when you provide compensation to a private party there is usually some kind of a damage finding or a damage hearing involved in that. And I do think that is possible to have with regards to the documents.

I do think you can put a price on, you know, the cost to replace a birth certificate or a DD–214, that those actually have costs that you can associate with them, you know, whatever the cost is when you call Vital Records to get a new one issued as well as coins. We have photographs that I know counsel for the defendant, ... and I have both talked with a coin expert regarding those photos and have an idea what the value as to those coins are. So I do think there is an ability to give some kind of a value to the coins and to the documents. But certainly I think that's—those are the two areas where I do see I think we could have some kind of an actual damage showing. And I think that's all, Your Honor.

THE COURT: All right. Thank you. . . . [Mr. Walters' counsel], anything that you would like to say?

[Mr. Walters' Counsel]: Your Honor, I note that in the transcript of the hearings, the Court explicitly says that, "It's very difficult to evaluate or to put a value on assets that are not present and, as a matter of fact, have disappeared." And you very clearly raised that at Ms. Walters' doorstep that these coins are no longer available to determine the exact amount.

Also, you know, Your Honor, I would point out that this trial was held roughly nine months ago, I believe. And Mr. Walters has been waiting since the entry of the judgment and decree of divorce to be compensated for the moneys that were awarded to him at that trial. He did get partial compensation, but that was only due to the fact that the Wyoming Steel company had to pay damages on a steel building that was awarded to him in the divorce trial.

And, Your Honor, I think that $10,000 probably falls short of what Mr. Walters is actually due. He's had now to pay for a three, three and a half, four-day trial. He's had to pay the costs of an appeal. And now here we are again here today. And to say that we need to have a hearing on damages I think is—is asking Mr. Walters to put up even more legal fees that I don't believe are necessary. I think $10,000 is probably less than adequate compensation for the time that he's had to wait to receive his judgment.

And, Your Honor, as far as Paragraph 10 goes, as [Mrs. Walters' counsel] has pointed out, I ordered a copy of the transcript and took the language from the transcript. But I believe that that paragraph could be corrected, Your Honor, simply by deleting the introductory phrase and just leaving that paragraph to say, "As sanctions against the plaintiff, she is ordered to pay the defendant the sum of $10,000 for the contempt set forth herein." That should solve the problem.

And I have that decree here with the original signatures on it. I would be willing to do that today and get it back to the Court for review.

THE COURT: All right. [Mrs. Walters' counsel], do you have a problem with that if we just—

[Mrs. Walters' Counsel]: Your Honor, just briefly, I agree with deleting the first portion of that, the punitive damages portion, but would ask that we put some clarification in that these are compensatory damages or something of that nature, the type of damages we're awarding here, whether it is a fine or if we're talking compensatory just to be clear on what this $10,000 is representing in that sentence.

THE COURT: You know, I'm sure it could be any clearer to be quite frank. It was sort of a composite of the delay, or the

taking of things that aren't here to be evaluated, the—I guess some of the emotional issues that go with having to just continue to be trying to stop someone from violating court orders that were entered in which another party is to my knowledge obeying. And putting those all together, that's the way it came out and to some extent with an effort to compensate for things that can never be valued. So I don't think I can get any more precise than that.

So I would probably just be inclined to go with [Mr. Walters' counsel's] solution. I don't think it would be helpful to hold another hearing. I know this matter is going to be appealed, and there's already an appeal pending in the divorce. I think the thing to do is just get the orders finalized and let the Supreme Court take a look at it. And, of course, whatever result they reach, I'll implement at their direction.

So I think I will—barring some other objection that I need to hear—I will go ahead and sign the order. All right. If you can just bring that to me . . . I'll keep it and take it back through for processing. I guess I'm not supposed to hand it back to the lawyers. We have a checklist. It is supposed to go through the proper—

[Mr. Walters' Counsel]: I wanted to make sure that Paragraph 10 didn't appear in the order part of the—

THE COURT: All right.

### STANDARD OF REVIEW

[¶ 18] The parties agree that the district court held Mrs. Walters in compensatory civil, not criminal, contempt. It is clear that the district court found that Mr. Walters had proved the elements of compensatory civil contempt by clear and convincing evidence. In this appeal, both parties accept that clear and convincing requirement, citing *United States v. Ford*, 514 F.3d 1047, 1051 (10th Cir.2008) (citing *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir.1998)). We will accept that requirement

for purposes of this case, cautioning that research of our jurisprudence has not located any decision preferring "clear and convincing" over "preponderance." [1] A definitive holding on that issue must await another day. We have said that clear and convincing evidence is that kind of proof that would persuade the trier of fact that the truth of the contention is highly probable. *In re JW*, 2010 WY 28, ¶ 24, 226 P.3d 873, 880 (Wyo. 2010) (quoting *SLJ v. Dep't of Family Serv.*, 2005 WY 3, ¶ 19, 104 P.3d 74, 80 (Wyo.2005)). We review the district court's factual findings in a bench trial with deference as they are presumptively correct and will be overturned only if, upon review of the entire evidence, we determine those factual findings to be clearly erroneous. *Ohio Cas. Ins. Co. v. W.N. McMurry Constr. Co.*, 2010 WY 57, ¶ 14, 230 P.3d 312, 320 (Wyo.2010). Factual findings are clearly erroneous when, although they have evidentiary support, we are left with the definite and firm conviction upon review of the entire evidence that the district court made a mistake. *Morris v. CMS Oil & Gas Co.*, 2010 WY 37, ¶ 12, 227 P.3d 325, 330 (Wyo.2010). We employ our *de novo* standard of review on the district court's conclusions of law. *Id.*

### DISCUSSION

[¶ 19] Mrs. Walters agrees that the district court's mutual restraining order concerning the parties' property or pecuniary interests filed August 20, 2008, at the outset of the divorce proceedings restrained and enjoined her from directly or indirectly doing any act which would defeat or render less effective the parties' property rights and pending interests including selling, giving away, alienating or otherwise disposing of the parties' property until further order of the district court. She agrees that the district court's decision letter dated April 15, 2009, incorporated into the Judgment and Decree of Divorce filed June 3, 2009, awarded the PJ trailer to Mr. Walters. In the contempt proceeding, the evidence revealed that when Mrs. Walters returned the PJ

1. For a discussion on the burden of proof in compensatory civil contempt, see Doug Rendleman, *Compensatory Contempt: Plaintiff's Remedy*

*When a Defendant Violates An Injunction*, 1980 U.Ill. L.F. 971, 980–81 (1980).

trailer and its title to Mr. Walters on June 11, 2009, the title showed a purchase date of April 20, 2009, and a Mr. Dinkel as seller and Mrs. Walters as buyer. The original title to the PJ trailer was issued in 2007. It appeared obvious that Mrs. Walters had done something with respect to Mr. Walters' interest in the PJ trailer that would defeat or render less effective that interest. Mrs. Walters' explanation was that she had intended to use the PJ trailer as collateral for a four thousand dollar loan from Mr. Dinkel; they filled out a loan agreement and presented the documents to the county clerk's office to have Mr. Dinkel recorded as a lienholder against the PJ trailer; the county clerk made a mistake and issued a new title showing Mr. Dinkel as the owner, not a lienholder; when that mistake was pointed out, the clerk issued a new and correct title; and, finally, instead of using the PJ trailer as collateral for Mr. Dinkel's loan, she sold him her wedding ring for $4,000. Mr. Dinkel testified as to these occurrences and stated he never had a lien on or possession of the PJ trailer.

[¶ 20] The district court was in the best position to assess the witnesses' credibility and weigh their testimony. That court addressed the PJ trailer issue in these words:

I find [Mrs. Walters'] explanation as to how that happened completely improbable. I mean, no one who has ever been to the county clerk's office without an adequate power of attorney and trying to transfer a vehicle could ever transfer property. And somehow Mr. Dinkel and Miss Walters say, oh, gee, the clerk just messed it up, titled this in the wrong way; and, son of a gun, it had to be titled back. That's not convincing to me.

Having reviewed the entire evidence relating to this issue, we hold that the district court's factual findings are not clearly erroneous.

[¶ 21] The judgment and divorce decree awarded to Mr. Walters "all coins contained in [Mrs. Walters'] safe, as well as any personal documents." Mr. Walters testified at the contempt proceeding that Mrs. Walters failed to return his military DD–214 form, passport, and birth certificate. Mrs. Walters did not explain her failure to return these personal documents. With respect to the coins, Mrs. Walters returned some coins to Mr. Walters on June 16, 2009; but Mr. Walters testified he did not receive four state-minted quarter sets, a gold double eagle coin, rolls of Eisenhower and Kennedy half-dollars, and Indian Head nickels. Mr. Walters' private investigator, who had photographed the coins from the safe on February 27, 2009, but was not able to complete a detailed inventory of the coins, testified there had been several gallon-sized bags nearly full of coins and a hinged metal box that contained coins; when the coins were returned, there were only two bags of coins and a plastic container containing a proof set. Mrs. Walters testified that, before returning the coins to Mr. Walters, she made an itemized list and a photographic inventory of the coins returned; that list and inventory were offered into evidence. She testified that the specific coins in the private investigator's photographs mentioned above were present in her photographs and list.

[¶ 22] Having heard the testimony and considered the evidence concerning the alleged violations in not returning the personal documents and the coins, the district court stated its factual findings:

With regard to the contents of the safe, I believe [Mr. Walters] has proven by clear and convincing evidence that [Mrs. Walters] willfully failed to return the coins, and specifically the gold double eagle coins, the Eisenhower half dollars, and the Indian Head nickels. I believe she's also willfully failed to return Mr. Walters' personal documents. . . .

I find it incredible that she offers no explanation. Those items were photographed. There has been testimony they haven't been returned. I think she would probably say, and I think I hear the defense saying that, well, gee, you can't really say how much was taken; and that's right. But I'll tell you what. I think, Miss Walters, your conduct amounts to spoilation and destruction of evidence which makes a precise determination of what has been taken impossible.

And that has frankly been a pattern throughout this case that in my opinion that you've taken things, hidden things,

and basically then tried to say, well, gee, you can't prove what I did with them now in court. And I think you run afoul of the spoilation of evidence rule which says that at the point that you destroy things, then I can make findings with regard to based on evidence that perhaps it was destroyed by you, that there's an inference that is both evidentiary and punitive which allows the Court to award sanctions based upon this conduct.

I don't find [Mrs. Walters'] inventory of the coins credible. I think [Mr. Walters'] photos show a substantial number of more coins. I found the testimony of ... Mr. Walters ... credible as to the amounts of the coins. And so I believe that it has been proven by clear and convincing evidence that Mrs. Walters willfully failed to return the contents of the safe as ordered.

■■ [¶ 23] In her appellate argument challenging the district court's factual findings about these violations, Mrs. Walters simply repeats the same argument she made below. As that argument failed below, it also fails here because the district court was in the best position to assess the witnesses' credibility and weigh their testimony. Having reviewed the entire evidence relating to this issue, we hold that the district court's factual findings are not clearly erroneous.

■■ [¶ 24] That does not end our discussion, however, because Mrs. Walters also challenges the amount of the compensation awarded by the district court to Mr. Walters for these violations. Specifically, she asserts that the compensatory civil contempt award must be based upon Mr. Walters' actual loss, and absent evidence showing the amount of that actual loss, any sum awarded is speculative and arbitrary and cannot stand. *United States v. United Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992) (citing *Allied Materials Corp. v. Superior Products Co., Inc.*, 620 F.2d 224, 227 (10th Cir.1980)). She claims there was no evidence of Mr. Walters' actual losses as to the coins and personal documents. During the proceedings on October 27, 2009, the district court assessed the sum of $10,000,

noting that it was "not calculated with great precision because the very nature of the acts ... are such as to make it impossible to calculate something resembling damages." The district court and the parties discussed this issue again on January 14, 2010. Mrs. Walters' counsel inquired about the district court's calculation of the $10,000 figure. The district court answered:

> There really wasn't any formula, I can tell you that. It was more kind of taking the magnitude of the case; the expense the parties were put to; the delay; the potential value, measurable or unmeasurable, of the property involved. Like, for example, some of the things that are just pieces of paper with sentimental value and how to value them, but yet there needed to be something by way of a sanction for not providing those. So it's a very imprecise process I would certainly grant you.

Mrs. Walters' counsel then stated it would be possible to have a damages hearing to determine the costs to replace the personal documents and to determine the value of the coins, so that an actual damage showing was made. Mr. Walters' counsel then commented that $10,000 "probably falls short of what [he] is actually due." The district court had the final word, saying:

> It was sort of a composite of the delay, of the taking of things that aren't here to be evaluated, the—I guess some of the emotional issues that go with having to just continue to be trying to stop someone from violating court orders that were entered in which another party is to my knowledge obeying. And putting those all together, that's the way it came out and to some extent with an effort to compensate for things that can never be valued. So I don't think I can get any more precise than that.

The district court then stated it would not be helpful to hold another hearing.

[¶ 25] Having carefully considered this record and the authority referred to above, we must conclude that no evidence of Mr. Walters' actual losses was presented and, absent that, the sum of $10,000 awarded to him is speculative and arbitrary and, reluc-

tantly, cannot stand. Consequently, we reverse that award.